NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

COLUMBIA UNIVERSITY, Respondent.

No. 967, Docket 75–4155.

United States Court of Appeals, Second Circuit.

Argued April 28, 1976.

Decided Aug. 25, 1976.

Robert G. Sewell, Marjorie S. Gofreed, Washington, D. C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., N.L.R.B.), for petitioner.

Putney, Twombly & Hirson, New York City (Charles O. Strahley, New York City, of counsel), for respondent.

Before LUMBARD, WATERMAN and MESKILL, Circuit Judges.

WATERMAN, Circuit Judge:

This is a petition by the National Labor Relations Board for enforcement of its order of May 22, 1975, finding that the discharge by Columbia University of its employee, Drucilla Cornell, violated section 8(a)(1) of the National Labor Relations Act ("NLRA")[1] and mandating her reinstatement with back pay and full restoration of her employee rights. Columbia has filed a cross petition for an order denying enforcement of the Board's order.

I

Drucilla Cornell was hired by the University in November, 1973 as a telephone operator for employment in the University's

---

1. Section 8(a)(1) [29 U.S.C. § 158(a)(1)] reads: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" section 7 [29 U.S.C. § 157], including "the right to self organization . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

central switchboard office. The following month, another employee, Muriel Hirschfeld, was hired for a similar position. Under University policy, each was to remain on probationary status for a period of 60 days after appointment. Each was given a list of operating procedures, prepared by their supervisor, Mrs. Onnie Lawton, as well as a personnel policies handbook which outlined a grievance procedure established by the University to' enable non-Union employees, such as Cornell and Hirschfeld, to "solve any serious problems related to [their] work or relationship with the university." Under that procedure, the aggrieved employee was first to meet with his immediate supervisor, then with his department head, and, finally, with the Director of Personnel. At each step the employee was entitled to ask a fellow employee to accompany him to any conference at which his problem was to be discussed.

The events which culminated in the discharge of Cornell and Hirschfeld began in January, 1974 when, early in the month, Lawton decided that Hirschfeld did not fit in with the other office employees. Unfamiliar with the procedures to be followed in dismissing an employee, she contacted the personnel department and was informed that she could discharge Hirschfeld without prior notice as Hirschfeld was still a probationary employee. Lawton was advised that it was most convenient for bookkeeping purposes to terminate an employee at the end of a pay period.

Later in that same month, some of the employees of the central switchboard office became increasingly dissatisfied with Lawton's supervisory policies and in particular with a recent change in telephone answering procedures that she directed. Cornell felt that these grievances should be brought to Lawton's attention, and on January 21, she discussed with her co-employees, and particularly with Hirschfeld, the possibility of forming a grievance committee. There is some conflict in the record regarding the reaction of the other employees to this suggestion and to Cornell's proposal that she speak to Lawton as a representative of the group, but, in any case, it appears that no real objection was voiced to the idea. During their lunch hour on that day, Cornell and Hirschfeld agreed that the former would first approach Lawton alone and present the employees' grievances and that Hirschfeld would then follow to explain that Cornell was speaking not only for herself but for other employees as well. They also agreed that if either of them was confronted with a "threatening situation," they would follow the University's grievance procedure by each acting as a "witness" for the other.

During the next few days there ensued a series of confrontations with Lawton, and also various activities by Cornell and Hirschfeld directed at making known their grievances to the supervisor. On two occasions they posted notices on the office bulletin board, the first of which read:

Workers do have rights. We have the right to bring our grievances to the attention of our employer. We have the right to organize to change our working conditions. We do not have to sit back passively and accept rules and regulations we think are unfair. Any group of us, chosen by election or directly, can represent the rest of the employees in designated bargaining unit [sic], equally as much so as an established union. The NLRB will protect any group of us equally as much as it will a union. There have been several precedent-setting cases in the last 2 years.

After this notice was removed by another employee and given to Lawton, a second statement was posted, which read: "Cows may come and cows may go, but the bull around this place goes on forever!!" This, too, was removed and shown to Lawton. Hirschfeld and Cornell discussed their dealings with Lawton with the night shift switchboard employees, one of whom cautioned them that their activities were risky and could result in their being discharged. During one confrontation with Lawton, Cornell stated that the NLRA protected the employees' rights to organize and to present their grievances to their supervisor, and offered to obtain a copy of the Act for Lawton's perusal.

On the morning of January 23, the brewing controversy came to a head. Lawton called Hirschfeld into her office to advise the latter of her dismissal. Hirschfeld then apparently told Lawton that she thought the dismissal was unfair, and that she wanted to speak to someone of higher authority. An acrimonious exchange followed, and, hearing the commotion, Cornell entered Lawton's office. The substance of the conversation between the three is sharply disputed by the parties, but it appears that at some point Cornell made known to Lawton that she wished, in accordance with University grievance procedures, to be present as a witness for Hirschfeld. Lawton urged Cornell in no uncertain terms to leave the office, and when Cornell refused to leave, Lawton handed her her paycheck and told Cornell that she, too, as well as Hirschfeld, was fired. Security guards, and then Lawton's superior, James McGrady, were called in.

Later that day, Cornell and Hirschfeld, alleging that they had been unlawfully discharged because of their organizational activities, filed formal grievances with the personnel department. Following a meeting with the personnel director, accompanied by outside witnesses, they were advised that Hirschfeld's discharge had been upheld, but that Cornell would be suspended from work for three days only. In a letter Cornell received some days later, she was told that her suspension was necessitated by her ". . . uncalled for interference with the normal conduct of business by the chief operator and your refusal to desist with this interference when ordered to do

so by the chief operator, your supervisor." It added: "You are, furthermore, warned that any repetition of the aforementioned conduct will result in the termination of your employment at Columbia University." Unwilling to accept the conditions placed upon her reinstatement and believing that the University grievance procedures justified her intervention on behalf of Hirschfeld in Lawton's office, Cornell advised McGrady that she would file a charge with the Board on behalf of Hirschfeld and herself. After her period of suspension expired, Cornell did not return to work; and McGrady spoke to her on the telephone and read to her a second letter which informed her that in view of her failure to report for work, the University had concluded that she had resigned.

A complaint was filed under section 8(a)(1) of the NLRA by District 65, Distributive Workers of America, on behalf of Hirschfeld and Cornell; and formal hearings were held before Administrative Law Judge Friedman. On July 31, 1974, he rendered a decision finding that the employees' grievance committee activities, and Cornell's intervention on behalf of Hirschfeld, were concerted activities protected by the NLRA, and that Columbia had committed an unfair labor practice in discharging the two employees.[2] He ordered, *inter alia*, that the University offer reinstatement to Hirschfeld and Cornell with full restoration of their employee rights and back pay, and post on campus a notice, a copy of which appears in the margin,[3] for a period of 60 days.

---

**2.** Administrative Law Judge Friedman found that the University's suspension of Cornell for three days with conditions placed upon her reinstatement, and its subsequent letter advising her that her failure to return to work under those conditions had been construed as resignation, constituted a constructive discharge. The Board adopted this conclusion, and we find no error in it.

**3.**
NOTICE TO<br>EMPLOYEES
*Posted by Order*<br>*of the National Labor Relations Board*<br>An Agency of the United States Government<br>We hereby notify our employees that:

WE WILL NOT discharge or refuse to reinstate any of our employees for engaging in lawful protected concerted activity such as forming grievance committees or discussing working conditions among themselves, or acting as witnesses for other employees pursuant to University policy in disciplinary or grievance procedures.

WE WILL NOT in any other manner interfere with, restrain or coerce our employees in the exercise of their right to form, join, or assist or be represented by any labor organization, to bargain collectively with representatives of their own choosing or engage in other

Columbia filed exceptions to the order and decision; and in an order of May 22, 1975, the Board, by a three-man panel, affirmed the decision of Judge Friedman as to Cornell, reversed as to Hirschfeld, and modified the order of the Administrative Law Judge to require that the language of the notice to be posted by Columbia be amended.[4] The Board concluded that Columbia had "discriminatorily terminated and refused to reinstate Drucilla Cornell," thereby engaging in an unfair labor practice proscribed by section 8(a)(1) of the Act. While thus adopting the Administrative Law Judge's reasoning and findings of fact as to Cornell, the Board found that the evidence did not support the similar findings as to Hirschfeld. It noted that Lawton had resolved on January 11 to discharge Hirschfeld and had been advised then that the end of a pay period, or January 23, would be the most convenient time to do so. Hirschfeld and Cornell had only openly commenced their activities directed at forming a grievance committee and presenting their complaints to their supervisor some ten days after January 11. Concerted activity could thus not have been a causative factor in Hirschfeld's discharge.

## II

In its cross petition for denial of an enforcement order, Columbia argues that there is insufficient evidence in the record as a whole to support the Board's finding of an 8(a)(1) violation as to Cornell, and that the Board relied upon inapplicable law in reaching its conclusion and failed to explain the reasons for its reliance thereon. Columbia further contends that even if we should approve the result the Board has reached, the University should not be required to post the "Notice to Employees" the Board has ordered Columbia to post because the embarrassment this will cause the University is disproportionate to the alleged wrongful discharge of but one employee.

Most of Columbia's arguments challenging the substantiality of the evidence are directed at what it contends were erroneous credibility determinations by the Administrative Law Judge, determinations claimed to have been mistakenly adopted by the Board. It alleges error in the finding that Hirschfeld and Cornell had discussed with their co-employees the formation of a grievance committee, in the finding that Lawton

concerted activities for the purpose of collective bargaining or other mutual aid or protection or to refrain from any or all such activities.

WE WILL offer Muriel Hirschfeld and Drucilla Cornell immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights or privileges, and WE WILL make them whole for any losses they may have suffered as a result of our unlawful action against them.

The apparent explanation of the phrase "pursuant to University policy" appearing in the above notice must relate to the fact, as stated at the outset of this opinion, that Cornell and Hirschfeld were handed handbooks entitled "Personnel Policies for supporting staff (nonunion)," in which there was set forth the University's personnel policy with reference to non-union employee grievances. The section, in pertinent part, reads as follows:

*Employee Grievances*

A procedure has been established to help the employee solve any serious problem related to his work or relationship with the University. As a first step, the problem should be discussed by the employee with his immedi-

ate supervisor. If no resolution of the problem is achieved, the employee may then appeal, as a second step, to the dean, director, or department chairman responsible for the area in which he works. If the problem is not resolved at this second step, the employee may then, if he so elects, state the basis of his grievance in writing to the Director of Personnel, who will meet with him to attempt a solution of the problem. *At any of the three steps above described, the grievant may ask a fellow employee to accompany him to any conference at which the problem is discussed.* As a final step, normally limited to problems of significant import where the employee is faced with disciplinary action or discharge, an arbitration panel may be requested by the employee. . . . (emphasis supplied)

4. The Board notice deletes the phrase "pursuant to University policy" which appeared in the notice mandated by the Administrative Law Judge and, of course, eliminates any reference to reinstating Muriel Hirschfeld to her former job.

had made changes in the work rules which resulted in employee dissatisfaction with Lawton's supervisory methods, and in the finding that Lawton knew of Cornell's concerted activities and dismissed her on January 23 in part because of those activities. While the evidence relied upon by the Board in support of its findings is far from overwhelming, we deem it sufficient to satisfy the "substantial evidence" standard articulated in § 10(e) of the NLRA.

It should be emphasized at the outset that the scope of our review of the Board's factual findings is quite limited. *See N. L. R. B. v. Universal Camera Corp.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). And questions of credibility are for the trier of fact. As we said in *N. L. R. B. v. Dinion Coil Co.*, 201 F.2d 484, 490 (2d Cir. 1952):

> [W]e surely may not upset the Board when it accepts a finding of an Examiner which is grounded upon (a) his disbelief in an orally testifying witness' testimony because of the witness' demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible or flatly contradicts either a so-called "law of nature" or undisputed documentary testimony. [citations omitted]

Contrary to the University's allegations, the record does not demonstrate that the Administrative Law Judge's evaluation of the testimony, accepted by the Board, was irrational or "hopelessly incredible." As Judge Friedman noted, witnesses for both parties "gave testimony which [presented] ambiguities, imponderables, half truths and exaggerations." His reconciliation of the many contradictions and disputed facts in that testimony, and his evaluation of the demeanor of the witnesses, is carefully and completely set forth in his decision of July 31, 1974.

The University's argument that the weight of the credible testimony compelled a finding that Hirschfeld and Cornell had not discussed the formation of a grievance committee with their fellow employees is belied by the testimony of switchboard employees Barbara Joyce and Morris Dunlop, who both corroborated Hirschfeld's and Cornell's statements to the effect that such organizational activities had been commenced prior to the dismissals. Joyce testified that when she returned from lunch on January 21, Marian Lloyd, Gwen Giscomb, and Roxanna Brandao, other switchboard employees, were engaged in a discussion with Hirschfeld and Cornell concerning Lawton's policies and regulations, and that Cornell advocated the formation of a grievance committee and indicated her intention to form one. Roxanna Brandao, Lawton's assistant, also begrudgingly admitted that during the three-day period of January 21–23, "there might have been something" said in the office about the possibility of the employees' joining together to present their grievances to their superior. Similarly, with reference to the Administrative Law Judge's conclusion that there were discussions among the employees during the period in question concerning their dissatisfaction with Lawton's supervisory policies, Joyce corroborated Hirschfeld's and Cornell's testimony. While one employee testified that she was not aware of any unusual dissatisfaction among the employees at that time and had not heard of any grievance committee plans, and another employee simply could not remember about the matter, there was sufficient evidence from the testimony of Hirschfeld, Cornell, and Joyce to support the Administrative Law Judge's conclusions on these points.

. [5] On the question of whether Lawton knew of the grievance activities, there was ample documentary and testimonial evidence developed at the hearing from which Judge Friedman could reasonably infer that she was aware of Hirschfeld's and Cornell's activities. Lawton admitted that Cornell and Hirschfeld spoke to her separately on January 21 and 22 about employee grievances, and she also admitted that she had

read the "workers do have rights" notice posted by Cornell in which the right of non-unionized employees to present grievances was declared. Lawton testified that she was aware that it was Cornell who had posted the notice and admitted that she had contacted her superior, McGrady, immediately after reading each of the two notices to tell him that they had been posted. Finally, there was testimony by Lawton's assistant, Betsy Reed, to the effect that the supervisor had definitely decided by January 22 to dismiss Hirschfeld and had stated on that day that if Cornell did not watch her step, she would be next. All this evidence, combined with the testimony by Hirschfeld and Cornell that Lawton was insecure in her relatively new supervisory position, and was perhaps even fearful that employees may have commenced concerted activity which would threaten her position, support the reasonableness of an inference that Lawton knew of the prospective plans to create a grievance committee.

Under the tests enunciated in *Wiese Plow Welding Co., Inc.,* 123 N.L.R.B. 616 (1959), tests properly applied by the Administrative Law Judge, direct evidence of employer knowledge of union or concerted activity is not a prerequisite to a finding that such knowledge existed. Rather, scienter may be inferred from the record as a whole. In *Wiese Plow,* as here, a finding of knowledge was derived from evidence of (1) the small number of employees at the place of business; (2) the fact that the discharged employee spoke in favor of concerted activity to other employees during the last week of her employment; (3) the timing of the discharge, which occurred immediately after concerted activity became apparent; and (4) the fact that the only two individuals who were active in the organization of a grievance committee or Union were simultaneously discharged. These factors, viewed cumulatively, support the propriety of the Administrative Law Judge's findings that indeed Lawton knew of Cornell's grievance activities, and that that knowledge was a key factor in the employee's discharge.

While we thus do not quarrel with the Board's adoption of the Administrative Law Judge's findings of fact, our difficulty with the Board's opinion arises when we move from those factual findings to the agency's conclusions of law. All that the Board said in affirming Judge Friedman's findings and conclusions regarding Cornell was:

We find, in agreement with the Administrative Law Judge, and for the reasons stated in his Decision, that Respondent violated Section 8(a)(1) of the Act when it suspended and then discharged employee Drucilla Cornell. *N. L. R. B. v. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975).

Columbia contends that *Weingarten* is inapposite and in no way provides authority for the Board's conclusion. In *Weingarten,* the Court held that section 7 of the NLRA guarantees an employee the right to union representation at an investigative interview with the employer when the employee reasonably fears it may result in disciplinary action, or in jeopardizing the employee's job. The § 7 mandate that "[e]mployees shall have the right . . . to engage in . . . concerted activities for the purpose of . . . mutual aid or protection" necessarily included, in the Court's view, the right of an employee to have the assistance and support that a union representative could afford during such a confrontation with a superior. 420 U.S. at 260, 95 S.Ct. 959 at 965.

Columbia points out, however, that *Weingarten* dealt only with investigative interviews, and that the interview here was called subsequent to a completed investigation and was called for the sole purpose of informing Hirschfeld that she was being discharged by Lawton. Additionally, Columbia contends that this case falls outside of the *Weingarten* holding and rationale as: (1) Cornell was not a union representative; (2) Hirschfeld did not specifically request Cornell's presence during the confrontation with Lawton; and (3) no opportunity was afforded either Hirschfeld or Lawton to determine whether they wished to proceed with a witness present or to terminate the interview. The Board's opinion does not

discuss these alleged distinguishing factors. Indeed there is no analysis of *Weingarten* and no explanation of any basis upon which the Board found that decision to be applicable. And, of course, the Administrative Law Judge had no occasion to consider the *Weingarten* decision, for it was decided by the Court after he had rendered his opinion.

■ In adjudicating these cross petitions for review we recognize that it is "a simple but fundamental rule of administrative law":

> [T]hat a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. *S. E. C. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

And we recognize the corollary to that fundamental proposition that, as the propriety of the agency's action is to be judged solely by the rationale it advances, "that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action . . . ." *Id.*, at 196–197, 67 S.Ct. at 1577. *See also F. P. C. v. Texaco, Inc.*, 417 U.S. 380, 396–97, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); *N. L. R. B. v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 443, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).

■ Applying this rule and its corollary in the case before us, we are unable to sustain the Board's action. At the very least, the decision is too ambiguous. It is unclear whether the Board agreed with the Administrative Law Judge that Cornell's grievance committee activities and her intervention on behalf of Hirschfeld during the confrontation with Lawton were both factors in Cornell's discharge. The single citation to *Weingarten* would suggest that the Board believed that only the latter, Cornell's intervention, played a part in Cor-

nell's dismissal, inasmuch as *Weingarten* speaks only to the right to engage in concerted activity in the context of an interview. While we might ourselves be inclined to find that the record supports a conclusion that the discharge resulted from either the grievance activities or Cornell's intervention, or both, we are powerless, in the absence of an unambiguous Board decision, to exercise our judgment on these matters for they are clearly committed for decision to the administrative agency.

Moreover, even if we were to infer that the Board means that Cornell's interposition at Hirschfeld's discharge caused Cornell's dismissal, *Weingarten*, within its own four corners, is no authority for the conclusion that that intervention was activity protected by the NLRA such that Cornell's discharge by Columbia could be deemed an unfair labor practice. *Weingarten* dealt with the investigative interview of an employee to determine whether the employee had engaged in activity which could warrant her subsequent dismissal. One rationale advanced by the Board, a rationale upheld by the Court, for affording the employee the right to have a witness present at such an interview is that the presence of the witness assures that a third party can confirm what actually transpires between the employee and employer during the confrontation. The employee "may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors." 420 U.S. at 263, 95 S.Ct. at 966. Also, an additional ground given for upholding this right is the fundamental basic guarantee of § 7 that employees be permitted to engage in concerted and mutual protection against arbitrary employer action.

However, even in the context of an investigatory interview which the employee reasonably fears will result in disciplinary action, *Weingarten* does not hold that the right to union representation is unconditional. *Weingarten* provides that before a witness may intervene the employee must request the presence of the witness and that the employer must consent to this re-

quest. If the employer declines to proceed with a representative present, the employee must then decide whether she would rather forego representation and continue the interview, or whether she will insist on representation and thereby forfeit whatever value the investigative interview might have for her, leaving the employer to investigate without the benefit of the employee's input or explanation. 420 U.S. at 257–59, 95 S.Ct. 959. Thus, neither the union representative nor the employee has an absolute right to insist on the representative's presence at the interview.

▉ Here, while Hirschfeld did not specifically request Cornell's presence at the time of the interview, that failure would not necessarily negate the *Weingarten* right if the Board should find that Hirschfeld had been deprived of an adequate opportunity to make that request to Lawton. Also, the fact that Cornell was not technically a union representative, and had merely agreed to represent the other employees in bringing their grievances to their supervisor, would not be a barrier to the assertion of the right of representation. As Justices Stewart and Powell noted in their dissent in *Weingarten*, 420 U.S. at 270 n.1, 95 S.Ct. 959, citing *N. L. R. B. v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), there can be little doubt that the protection afforded to concerted activities under the NLRA applies equally to workers in unionized or in non-unionized firms. Beyond these two factors, however, it is wholly unclear why the Board found that *Weingarten* provided justification for the Board's holding. The Board did not indicate how it reconciled the record before it with the *Weingarten* requirement that the employer and employee be given the option of proceeding without a

witness present, for this record is notably barren of any evidence of such a choice. Moreover, the Board failed to make clear whether it believed the Hirschfeld-Lawton confrontation could be termed an investigative interview or a disciplinary interview, or neither. It would seem that the distinction is of some importance for though the right to a representative pertains in the investigatory context, as in *Weingarten*, and in certain disciplinary contexts, as set forth in earlier Board holdings recognized by the court in *Weingarten*, 420 U.S. at 260, 95 S.Ct. 959, see, e. g., *Texaco, Inc., Houston Producing Division*, 168 N.L.R.B. 361 (1967), enforcement denied, 408 F.2d 142 (5th Cir. 1969); *Jacobe-Pearson Ford, Inc.*, 172 N.L.R.B. 594 (1968),[5] it is unclear if and when that right may be asserted in interviews which do not fall within either of those categories. The existence of the right has been keyed to the type of interview conducted, and the Board has here failed to elucidate the basis upon which it concluded that intervention by a witness at this interview was appropriate or necessary.

▉ Upon this petition for enforcement, the Board sets forth the reasoning which it contends places Cornell's intervention on behalf of Hirschfeld within the area of activities protected by § 7 of the Act. But as the Court stated in *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962), we "may not accept appellate counsel's *post hoc* rationalizations for agency action . . ." The purpose of the *Chenery* rule requiring that an agency's discretionary order be upheld, if at all, on the same basis articulated by the agency is to avoid "propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency." 332 U.S. at 196, 67 S.Ct. at 1577.

**5.** While those decisions involved the right to have a union representative present, pursuant to *N. L. R. B. v. Washington Aluminum Co.*, *supra*, the representative right they uphold must also apply to a non-union representative. In its decision in *Weingarten*, 202 N.L.R.B. 446 (1973), the Board expanded the representative right applicable in disciplinary hearings to include investigatory interviews which the employee reasonably fears will result in his disci-

pline, and the U.S. Supreme Court sustained that expansion upon appeal from the decision in *N. L. R. B. v. J. Weingarten, Inc.*, 485 F.2d 1135 (5th Cir. 1973), in which the Fifth Circuit had denied enforcement of the Board's *Weingarten* order. The representative right is guaranteed and therefore the right cannot be made to depend upon whether the person accompanying the employee is a union member or is non-union.

**932**

See also *Phelps Dodge Corp. v. N. L. R. B.*, 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

In § 10 of the NLRA, 29 U.S.C. § 160, the Board is vested with the authority to enforce and effectuate the provisions of that Act, and the Court has noted the special deference that is to be accorded a Board determination of "whether or not the 'need' [for union assistance at an interview] exists in light of changing industrial practices and the Board's cumulative experience in dealing with labor management relations." *Weingarten, supra,* 420 U.S. at 266, 95 S.Ct. at 968. If the Board here intended to expand the representative right upheld in *Weingarten,* or intended to create a new right growing out of its experience in effectuating the policy of the Act, it failed to make clear its intentions. As the decision below now stands, the Board has chosen to rely on a single judicial precedent without explaining its applicability, and, under these circumstances, *S. E. C. v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and its progeny dictate that we remand for such further proceedings as may be deemed appropriate.

In view of our denial of the petition for enforcement, and the necessity for a remand, it would be inappropriate at this stage to reach the additional point of error raised by Columbia with reference to the notice it has been ordered to post on campus.

Enforcement denied; remanded to the Board for further proceedings not inconsistent with this opinion.