**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMERICAN GERI–CARE, INC., Respondent.**

**No. 180, Docket 82–4053.**

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1982.

Decided Dec. 23, 1982.

Certiorari Denied April 25, 1983. See 103 S.Ct. 1876.

Jonathan Saperstein, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Morris Tuchman, New York City (Gluck & Tuchman, New York City, of counsel), for respondent.

Before FRIENDLY, MESKILL and CARDAMONE, Circuit Judges.

MESKILL, Circuit Judge:

The petitioner, National Labor Relations Board (Board), has submitted an application pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1976) (NLRA), for enforcement of its September 30, 1980 order against the respondent, American Geri-Care, Inc. (the Company). Jurisdiction is properly conferred on this Court by Section 10(e) of the Act because the Board seeks enforcement of a final order in which the Company was found guilty of several unfair labor practices. We conclude that the Board's findings were supported by substantial evidence and therefore order that the decision of the NLRB be enforced under the terms outlined in the administrative decision.

*Background*

American Geri-Care is a New York corporation principally engaged in the business

of providing health care, staffing and related services to various medical institutions in the greater New York City area.[1] The Company derives substantial revenue by contracting to staff local nursing homes from its pool of registered nurses and related medical personnel. Under one such contract, the Company agreed to provide the Aischel Avraham Nursing Home in Brooklyn with thirteen registered nurses to service that institution during the 1979 fiscal year. The events giving rise to the Board's unfair labor practice findings each occurred at the Avraham facility.

The group of nurses assigned to the Avraham Home did not belong to a union when they commenced working at that institution. They were subsequently approached, however, by two rival unions who sought to enlist their support for unionization. On October 29, 1979, one of these unions, Local 144, Hotel, Hospital, Nursing Home and Allied Health Services Union, SEIU, AFL–CIO (Local 144), filed a representation petition on behalf of the unit of registered nurses employed by the Company at the Avraham facility. The rival union, Local 6, International Federation of Health Professionals, International Longshoreman's Association, AFL–CIO (Local 6), requested and was granted permission by the NLRB to participate in the union election. A closed ballot election was held on December 20, 1979, and Local 144 was narrowly defeated.[2]

On December 28, 1979, Local 144 filed timely objections to conduct affecting the results of the election. Local 144 principally alleged that the Company had engaged in a broad range of unfair labor practices in an effort to defeat the union's election bid. The union requested that an administrative hearing be held to consider these charges and, for purposes of this appeal, two important rulings were made at that hearing. The Administrative Law Judge (ALJ) found that: (1) the Company had violated Sections 8(a)(1), (3) and (4) of the NLRA, 29 U.S.C. § 158(a)(1), (3), (4), by harassing, discharging and failing to reinstate Shirley Anenburn because she had engaged in protected labor activity; and (2) the Company had violated Section 8(a)(1) of the NLRA by promising and granting its employees special benefits to induce them to vote against unionization.[3]

The ALJ subsequently ordered that Shirley Anenburn be reinstated, with full back pay and seniority, to her former position as a registered nurse at the Avraham facility. He also ruled that a new election be held because the prior voting had been tainted by the Company's illegal promise of special benefits. *In the Matter of American Geri-Care*, NLRB, JD–(NY)–57–81 (June 15, 1981), *reprinted in* J.App. at 8. The Board affirmed the ALJ's findings and rulings. *American Geri-Care, Inc.*, 258 N.L.R.B. 1116 (1981).

*Discussion*

A. *Anenburn Incident*

Shirley Anenburn was employed by the Company during most of 1979 as a registered nurse at the Avraham facility.[4] Anenburn actively supported Local 144 during the pre-election campaign. She signed an

---

1. Respondent concedes that it is engaged in commerce within the meaning of § 2(6) and (7) of the Act, 29 U.S.C. § 152(6), (7) (1976), and is therefore amenable to the jurisdiction of the NLRB.

2. Of the approximately thirteen nurses who were eligible to vote in this election, five voted against the participating unions, three voted for Local 144, and no one voted for Local 6. One additional person voted, but her vote was successfully challenged and thus was not included in the final tally. *See* J.App. at 9.

3. The union raised additional unfair labor practice claims in the administrative proceeding, but these claims were rejected by the ALJ and the union has not sought review. *See* J.App. at 12–13.

4. The Company initially argued that Anenburn, as charge nurse for the third floor, was a "supervisor" within the meaning of § 2(11) of the Act, 29 U.S.C. § 152(11) (1976), and therefore was not a protected employee under the Act. The ALJ rejected this argument and the Company concedes on appeal that Anenburn was not a "supervisor." *See Meharry Medical College*, 219 N.L.R.B. 488, 490 (1975); *Wing Memorial Hospital Ass'n*, 217 N.L.R.B. 1015 (1975).

authorization card, collected cards from other nurses, and attended an organizational meeting sponsored by the union. Anenburn was subpoenaed to appear as a witness on behalf of Local 144 at an NLRB representation hearing that was held on November 15, 1979.[5] The parties concede that the Company was aware of Ms. Anenburn's pro-union sympathies.

Management's treatment of Ms. Anenburn took a decided turn after she appeared at the Board hearing on behalf of Local 144. On November 16, 1979, one day after she attended the representation hearing, the Company issued a warning notice to Anenburn citing her for tardiness. On the following day, November 17, 1979, management denied Anenburn's request for vacation leave even though she had been assured verbally that her application would be granted. Finally, Ms. Anenburn was discharged on November 21, 1979, purportedly because she abandoned a dying patient while on duty.

At the conclusion of the administrative proceedings, the ALJ reviewed these incidents and found that the Company took action against Ms. Anenburn not for prudent business reasons, but rather principally in retaliation for her support of Local 144. He cited American Geri-Care for violations of Sections 8(a)(1), (3) and (4) of the Act.

Sections 8(a)(1), (3) and (4) of the National Labor Relations Act provide in pertinent part that it shall be an unfair labor practice for an employer:

(1) to interfere with, restrain, or coerce employees in the exercise of [their Section 7 rights];[6]

. . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ; [and]

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.

Codified as amended at 29 U.S.C. § 158(a)(1), (3) and (4) (1976).

Actions commenced under these provisions often raise difficult issues of fact, including the critical question of employer motivation for undertaking the acts complained of. Management typically argues, for example, that its decision to issue an employee warning notice was guided by prudent business judgment. The General Counsel and the aggrieved employee generally respond that the employer was motivated principally by anti-union animus when issuing the disputed citation and that the "business judgment" explanation is merely a pretense or sham.

The NLRA vests primary responsibility in the National Labor Relations Board to resolve these difficult questions of fact. *See* 29 U.S.C. § 160(e) (1976). The Board is empowered to review the evidence presented in the administrative proceeding, to assess the credibility of witnesses, and ultimately to decide whether the claims of the employer or the employee are more persuasive. The Court's scope of review on petition for enforcement of an NLRB order is properly quite limited. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *NLRB v. Columbia University,* 541 F.2d 922, 928 (2d Cir.1976). The Court will affirm the factfindings of the Board if there is "substantial evidence on the record considered as a whole, taking into account

---

5. Although Ms. Anenburn did not testify at the Board hearing, management was aware that she was present at the request of Local 144. *See* J.App. at 61–64.

6. Section 7 of the Act, 29 U.S.C. § 157 (1973), provides in pertinent part:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

whatever in the record fairly detracts from its weight, but giving due regard to the Board's expertise." *NLRB v. International Metal Specialties, Inc.,* 433 F.2d 870, 871 (2d Cir.1970), *cert. denied,* 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971); *see United Aircraft Corp. v. NLRB,* 440 F.2d 85, 91 (2d Cir.1971).

■ We have also noted that the findings of the Board " 'cannot lightly be overturned,' " *NLRB v. Advanced Business Forms Corp.,* 474 F.2d 457, 464 (2d Cir.1973) (*citing United Aircraft Corp. v. NLRB,* 440 F.2d 85, 91 (2d Cir.1971), and *NLRB v. Gladding Keystone Corp.,* 435 F.2d 129, 132 2d Cir.1970)), especially when these findings are based upon the Board's assessment of witness credibility. *See NLRB v. Columbia University,* 541 F.2d 922, 928 (2d Cir.1976); *NLRB v. Dinion Coil Co.,* 201 F.2d 484, 490 (2d Cir.1952). Indeed, credibility findings made by the ALJ and accepted by the Board will not be overturned unless they are "hopelessly incredible" or they "flatly contradict" either the "law of nature" or "undisputed documentary testimony." *NLRB v. Columbia University,* 541 F.2d at 928; *NLRB v. Dinion Coil Co.,* 201 F.2d at 490.

### 1. *The Warning*

■ On November 16, 1979, one day after she appeared at the representation hearing, the Company issued a written warning notice to Anenburn. She was cited for arriving late to work on various dates between September 22, 1979 and November 3, 1979. *See* J.App. at 329. Anenburn testified at the NLRB hearing that she had received oral permission to arrive late on the days cited in the warning. She also stated that the Company had never before issued a warning to her and further that management had complimented her on several occasions for her exemplary work.

The ALJ found that Ms. Anenburn had testified credibly when relating the events that precipitated her warning notice. He also noted that Anenburn had never previously been cited for tardiness. The ALJ found the timing of the Company's decision to issue a warning notice to be especially troubling. He questioned why management would have waited until one day after Ms. Anenburn had appeared at a Board representation hearing to cite her for instances of tardiness that occurred in most cases one month prior to the citation.[7]

There is substantial evidence to support the ALJ's finding here, as adopted by the Board. *See Universal Camera Corp. v. NLRB,* 340 U.S. at 488, 71 S.Ct. at 464; *United Aircraft Corp. v. NLRB,* 440 F.2d at 91. Nothing in the record suggests that Ms. Anenburn's testimony was hopelessly incredible or that it flatly contradicted the laws of nature. *NLRB v. Columbia University,* 541 F.2d at 928. The ALJ also properly considered the timing of management's decision to issue the disputed warning. An inference of anti-union animus is proper when the timing of the employer's actions is "stunningly obvious." *NLRB v. Long Island Airport Limousine Service Corp.,* 468 F.2d 292, 295 (2d Cir.1972) (quoting *NLRB v. Rubin,* 424 F.2d 748, 750 (2d Cir.1970)); *see NLRB v. Advanced Business Forms Corp.,* 474 F.2d 457, 465 (2d Cir.1973) (timing and abruptness of discharge are persuasive evidence of motivation). The Company did not explain persuasively the reasons why it chose to wait until November 16, 1979 to issue the warning notice, *see Grandee Beer Distributors, Inc. v. NLRB,* 630 F.2d 928, 932 (2d Cir.1980); *NLRB v. Styletek,* 520 F.2d 275 (1st Cir.1975), and did not convincingly discredit Anenburn's testimony. The evidentiary record supports the findings of the ALJ on this issue.

### 2. *Denial of Vacation Leave*

■ On October 19, 1979 Ms. Anenburn requested two weeks vacation leave, to commence on December 29, 1979. She planned to be married during that vacation and had expected to use the remainder of her leave to take a honeymoon. Anenburn

---

7. The citation was issued on November 16, 1979. Most of the dates included in the citation for tardiness were early in October of 1979. *See* J.App. at 329–31.

testified that Ms. June Stuart, the In-Service Instructor, had orally assured her that the vacation request would be granted. Further testimony revealed that Director Milano, the Company's most senior representative at the Avraham facility, knew as early as November 7, 1979 that Anenburn expected to be married during her December vacation. In fact, Juanita Palma, the Assistant Director of Nursing at the Avraham Home, testified at the administrative proceeding that Director Milano stated to her: "She said she was not going to give her [Anenburn] the time off and she wants her out." *See* J.App. at 12.

Anenburn's request for vacation leave was denied on November 17, 1979, one day after she was issued the warning notice and two days after she had appeared at the representation hearing before the Board. The ALJ found that management's refusal to grant Anenburn's request for vacation leave constituted "another step in the harassment of Anenburn for her union related activities." *In re American Geri-Care, Inc.,* NLRB, JD–(NY)–57–81, at 5 (June 15, 1981), *reprinted in* J.App. at 1, 12. The judge cited the Company for violations of Sections 8(a)(1) and (4) of the Act.

Once again, the ALJ's findings were principally based upon determinations of witness credibility. The ALJ credited the testimony of Ms. Palma and Ms. Anenburn and noted that the Company had not persuasively explained why it had waited for more than one month to deny Anenburn's request. These credibility findings accepted by the Board are not hopelessly incredible or irrational. *See NLRB v. Columbia University,* 541 F.2d at 928; *NLRB v. Dinion Coil Co.,* 201 F.2d at 490. Moreover, the Board properly could infer unlawful motivation from the stunningly obvious timing of management's decision to deny Anenburn's vacation request, *see NLRB v. Advanced Business Forms Corp.,* 474 F.2d at 465; *see also NLRB v. Long Island Airport Limousine Service Corp.,* 468 F.2d at 295, and from the Company's inability to explain persuasively why it decided to deny Ms. Anenburn's request two days after she had appeared at the Board representation hear-ing. *See Grandee Beer Distributors, Inc. v. NLRB,* 630 F.2d at 932; *NLRB v. Styletek,* 520 F.2d at 278. Accordingly, we conclude that the ALJ's decision, as adopted by the Board, to cite the Company for violations of Sections 8(a)(1) and (4) is supported by substantial evidence.

### 3. ·Discharge of Anenburn

█ The events leading to the discharge of Ms. Anenburn occurred during the morning of November 20, 1979. Ms. Anenburn was working the 7:00 a.m.–3:30 p.m. shift on the third floor of the Avraham facility at that time. Shortly after commencing work on that day, Anenburn was informed that one of her patients, Mrs. Serena Dimant, was unable to breathe without serious difficulty. Anenburn promptly paged Assistant Director Palma to apprise her of the situation.

Palma explained that when she arrived in Mrs. Dimant's room, Anenburn was checking the patient's vital signs. Palma further testified that Anenburn administered oxygen to Mrs. Dimant and competently cared for the patient while she left to call for an ambulance. The parties concede that during the entire Dimant incident at least one additional registered nurse and one licensed practical nurse were present to assist Mrs. Dimant. Mrs. Dimant subsequently was taken by ambulance to the hospital. She returned, fully recovered, to the Avraham facility the following day.

Ms. Anenburn was notified during the Dimant incident that her mother had called the Avraham Home and had indicated that she was not feeling well. Ms. Palma noticed later that morning that Anenburn was preoccupied with the state of her mother's health. Palma decided to give Anenburn permission to leave work early so that she might care for her mother. Director Milano conceded that management knew Anenburn had permission to leave work early. She also testified that Ms. Palma was fully authorized by the Company to grant such requests. In fact, Milano observed Anenburn leaving early on that date but did not

attempt to ascertain the reasons for her departure.

Director Milano telephoned Anenburn later that evening and indicated to her that management would expect a doctor's note explaining why her mother's condition had required hospitalization. Anenburn stated to Milano that even though her mother was diabetic and hypertensive, her condition did not warrant hospitalization. She thus explained that it would be impossible to get a doctor's note.

Upon reporting to work the next morning, November 21, 1979, Anenburn noticed that her punch card was not in its usual place. She was instructed at that time to report to the nursing office. Anenburn subsequently met with Mr. Gary Stern[8] and Director Milano in the nursing office. Prior to commencing this interview, however, Anenburn requested that another employee be present during the course of the meeting.[9] When Mr. Stern denied this request, Anenburn indicated that she would not meet with Stern and Milano alone. Stern promptly informed Anenburn: "So I told her under those circumstances she could take her coat and go home, she was terminated." See J.App. at 196. Anenburn was not given an official reason for her discharge at that time, nor did she receive an official termination notice. Mr. Stern did testify at the administrative proceeding, however, that Anenburn was terminated because "she abandoned a dying patient." See J.App. at 14.

The ALJ found the Company's asserted reason for discharging Anenburn to be "clearly pretextual." See J.App. at 14. He credited the testimony of Anenburn and Palma and noted that the statements of these witnesses were largely corroborated by the nursing supervisor at the Avraham facility, Mrs. Elsa Wilson.[10] The judge also found that the Company was aware that Anenburn had permission to leave early on November 20, 1979, and that the evidence offered at the administrative proceeding conclusively proved that Ms. Anenburn performed her duties professionally and competently during the Dimant incident. He concluded that:

> I find that Annenburn [sic] gave proper care to the patient, Mrs. Dimant. She was then given permission by Palma, who had authority to give such permission, to leave the Home. Milano and Stern knew that she was given that permission before they terminated her. I find that Annenburn's [sic] termination was a culmination of events which started with the giving of the warning notice and then the refusal to approve the request for leave. These actions were taken by Respondent because of Annenburn's [sic] activity on behalf of Local 144 and because of her appearance at the Board hearing on November 15.

*In re American Geri-Care, Inc.*, NLRB, JD–(NY)–57–81, at 8 (June 15, 1981), *reprinted in* J.App. at 1, 15. The ALJ cited American Geri-Care for violations of Sections 8(a)(1), (3) and (4) of the Act, based upon his findings of unlawful discharge. The Board subsequently adopted these findings.

There is substantial evidence to support the Board's ruling that American Geri-Care was motivated by anti-union animus, *not* sound business judgment, when discharging Shirley Anenburn. *See United Aircraft Corp. v. NLRB,* 440 F.2d at 91; *NLRB v. International Metal Specialties, Inc.,* 433 F.2d at 871. Management has not offered any persuasive evidence to support its contention that Anenburn abandoned a dying patient. Indeed, the individuals who were present during the Dimant incident each testified at the NLRB proceeding that Anenburn performed her duties professionally and capably when administering to Mrs.

---

**8.** Mr. Stern served as Secretary of American Geri-Care during the period in question.

**9.** Ms. Anenburn apparently was concerned that her version of the events that transpired during this meeting might be refuted by the two representatives of management and thus the only

way to protect herself would be to have another employee present.

**10.** Mrs. Wilson was Anenburn's supervisor during the disputed Dimant incident and since May of 1980 has served as Assistant Director of Nursing at the Avraham Nursing Home.

Dimant. The ALJ credited this testimony and management has been unable to show that the statements of Ms. Palma, Mrs. Wilson, or Ms. Anenburn were hopelessly incredible or irrational. *NLRB v. Columbia University,* 541 F.2d at 928; *NLRB v. Dinion Coil Co.,* 201 F.2d at 490. This is not a case where the employer has accumulated strong evidence of employee neglect or incompetence,[11] or where there is substantial probative evidence both supporting and refuting charges of unlawful management motivation.[12] Rather, the evidence presented at the administrative proceeding revealed that Anenburn was a capable employee who was subjected to three acts of management harassment within the space of one week—the tardiness notice, the denial of vacation leave, and the discharge—precisely because she had engaged in protected union activity.

■ Counsel for management argues, however, that the ALJ erred when he applied the so-called *Wright Line* test to the facts of this case. In *Wright Line, A Division of Wright Line Inc.,* 251 N.L.R.B. 1083 (1980), *enf'd on other grounds,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the Board announced that it would henceforth shift the burden of proof in dual-motive discharge cases. 251 N.L.R.B. at 1087–88. Under this approach, once the General Counsel has made a strong *prima facie* showing of unlawful motivation, the burden of proof shifts to the employer. To prevail, management must show that it would have taken the same action even if the employee

had not engaged in protected labor activity. *Id.* The Board noted in *Wright Line* that the burden shift contemplated by its decision had been applied by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), where a public employee alleged that a motivating factor in the non-renewal of his contract was his constitutionally protected activities.

Counsel for management concedes that the *Mt. Healthy* test may be proper in constitutional cases, but asserts that it is singularly inappropriate to apply this burden shift in discharge cases under the NLRA. Counsel correctly notes that there is a substantial division in the Circuits over the question of whether the Board may properly shift the burden of proof in discharge cases.[13]

■ This Court need not resolve the *Wright Line* issue in this appeal, however, because there is substantial evidence to support the Board's finding that management's explanation for Anenburn's discharge was clearly pretextual. The ALJ specifically noted at two points in his administrative decision that the Company's justification for terminating Anenburn, *i.e.,* for abandoning a dying patient, was mere pretext. *In re American Geri-Care, Inc.,* NLRB, JD–(NY)–57–81, at 7, 12 (June 15, 1981), *reprinted in* J.App. at 14, 19.

Once the finding of pretext is made, and is supported by substantial evidence in the enforcement proceeding, the adjudication is complete and neither the Board nor the

11. *See, e.g., NLRB v. Long Island Airport Limousine Service Corp.,* 468 F.2d 292 (2d Cir. 1972), where this Court, even though conceding that the discharged employee was not an exemplary worker (truck driver with many speeding violations, frequent tardiness, and consistently failed to turn in daily cash receipts promptly), nonetheless held that management's discharge of this employee (union official) shortly before the union election raised the permissible inference that the discharge was motivated by anti-union animus. *Id.* at 296.

12. *See NLRB v. Columbia University,* 541 F.2d 922 (2d Cir.1976), where this Court, although acknowledging that the testimony on the question of unlawful motivation was conflicting,

nonetheless held that it would not second-guess the findings of the ALJ, as adopted by the Board. *Id.* at 928.

13. *Compare* cases rejecting *Wright Line* burden shift, *Behring Int'l, Inc. v. NLRB,* 675 F.2d 83, 88 (3d Cir.1982); *Wright Line, A Division of Wright Line Inc.,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *TRW, Inc. v. NLRB,* 654 F.2d 307, 310 (5th Cir.1981), *with* these cases that have adopted the shift, *Justak Bros. and Co. v. NLRB,* 664 F.2d 1074, 1077 (7th Cir. 1981); *NLRB v. Nevis Indus., Inc.,* 647 F.2d 905, 909 (9th Cir.1981).

Court need engage in the *Wright Line* analysis. *NLRB v. Charles Batchelder Co.*, 646 F.2d 33, 39 (2d Cir.1981).[14] In his concurring opinion in *Batchelder* Judge Newman has argued that the burden shift espoused in *Wright Line* cannot be applied in pretext cases and is appropriate, if at all, *only* in the second type of discharge case, the dual motive case. *Id.* at 43. Indeed, implicit in the finding of pretext is the judgment of the court that the employer has not marshalled any convincing evidence to support its position. Thus, any reference in this action to the *Wright Line* standard was unnecessary and does not detract from the Board's finding of pretext.

■ We are, of course, mindful of the Supreme Court's statement in *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943), that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." But the *Chenery* doctrine, as Professor Davis has rightly said, has been "softened in its application." 3 K. Davis, Administrative Law Treatise § 14.29, at 130 (2d ed. 1980). It does not mean that a reversal and remand are required each and every time an administrative agency assigns a wrong reason for its action; rather, it requires reversal and remand *only* where there is a significant chance that but for the error, the agency might have reached a different result. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969) (plurality opinion); *Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964); Friendly, Chenery *Revisited: Reflections On Reversal And Remand Of Administrative Orders*, 1969 Duke L.J. 199, 210–11. We are convinced in this case that even if we were to find the Board's *Wright Line* test to be inconsistent with the NLRA, reversal and remand would be an "idle and useless formality," *NLRB v. Wyman-Gordon Co.*, 394 U.S. at 766 n. 6, 89 S.Ct. at 1430 n. 6, because there is not the slightest doubt that the Board would simply reaffirm its order on the ground that the employer's reasons for discharging Anenburn were clearly pretextual.

Finally, it should be noted that even the First Circuit, which has most vigorously opposed the burden shift contemplated in *Wright Line,* routinely enforces orders that rely on the *Wright Line* analysis as long as the Board has also made a supportable finding of pretext. Where the Board's decision has not turned on "the niceties of burdens of proof," *NLRB v. Magnesium Casting Co.*, 668 F.2d 13, 16 (1st Cir.1981), the First Circuit has concluded that no remand is necessary. *See NLRB v. Steinerfilm, Inc.*, 669 F.2d 845, 850 (1st Cir.1982); *NLRB v. Wright Line, A Division of Wright Line, Inc.*, 662 F.2d 899, 907 n. 13 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).[15]

The Court orders that the decision of the Board on the discharge issue be enforced according to the terms outlined in the administrative opinion.

*B. Promise of Benefits*

Director Milano arranged a meeting with the nursing staff of the Avraham facility

14. As a practical matter, the ALJ often will reach the *Wright Line* issue as an alternative basis for his unfair labor practice findings even though, as here, a finding of pretext is warranted by the evidence. Specifically, the ALJ typically will rule that even if the court does not find substantial evidence to support a pretext holding, there is substantial evidence in the dual motive case (implicating *Wright Line*) to support a finding that the Company would not have fired the discharged employee but for his union activities.

15. In *Consolidated Edison Co. v. Donovan*, 673 F.2d 61 (2d Cir.1982), this Circuit ruled that the burden shift contemplated in *Wright Line* is permissible under the Energy Reorganization Act, § 210, 42 U.S.C. § 5851 (Supp. II 1978). *Id.* at 62–63. We need not decide in this appeal whether the *Wright Line* burden shift is also permitted under the NLRA because the finding of pretext is a sufficient, independent ground to sustain the decision of the Board. We note that the Supreme Court has recently granted *certiorari* to resolve the *Wright Line* question in a NLRA case. *See NLRB v. Transportation Management Corp.*, 674 F.2d 130 (1st Cir.), *cert. granted*, —— U.S. ——, 103 S.Ct. 372, 74 L.Ed.2d 506 (1982).

approximately ten days before the union election was scheduled to be held.[16] Milano urged the nurses who attended that meeting to vote for management and intimated that the Company would increase wages and benefits if it prevailed in the union election. The parties stipulated that the unions were unsuccessful in the December 20, 1979 election and further that the registered nurses at the Avraham facility received a wage increase and an additional week's vacation, effective January 1, 1980.

The ALJ found that the Company had violated Section 8(a)(1) of the Act by unlawfully promising benefits to its employees to induce them to vote against a particular union. He ordered that a new union election be held and that the Company cease and desist from promising and granting benefits to induce its employees to vote against the union. *In re American Geri-Care, Inc.,* NLRB, JD–(NY)–57–81, at 15–16 (June 15, 1981), *reprinted in* J.App. at 22–23.

The Court's scope of review in Section 8(a)(1) unlawful promise cases is circumscribed by the same general legal standards that apply in Section 8(a)(1) discharge cases. 29 U.S.C. § 160(e) and (f) (1976); *NLRB v. Charles Batchelder Co.,* 646 F.2d at 38; *see Grandee Beer Distributors, Inc. v. NLRB,* 630 F.2d 928, 932 (2d Cir.1980). In both cases, the Court's inquiry on petition for enforcement is limited. We must determine whether substantial evidence supports the findings of the ALJ, as adopted by the Board, and we must not " 'displace the Board's choice between two fairly conflicting views, even though the Court would justifiably have made a different choice had the matter been before it *de novo.*' " *NLRB v. Charles Batchelder Co.,* 646 F.2d at 38, quoting *NLRB v. Walton Manufacturing Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962) (per curiam) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)).

Nurse Charles was present at the December meeting and she testified that Director Milano intimated during this meeting that the nurses could expect increased wages and benefits if they voted against the union. The ALJ credited this testimony. He also noted that the timing of management's decision to increase wages and benefits (January 1, 1980) raised an inference of unlawful conduct and that the Company had failed to rebut this inference. The ALJ indicated that Section 8(a)(1) could be violated, even if the promise of benefits was not expressly made contingent on voting against the union, where the timing of the offer indicated a coercive purpose and effect. *In re American Geri-Care, Inc.,* NLRB, JD–(NY)–57–81, at 13 (July 15, 1981), *reprinted in* J.App. at 20.

■ There is substantial evidence to support these findings. Nurse Charles' testimony was not incredible or irrational. Her recollection of the events that transpired at the December meeting reveals that the Company tacitly had represented that benefits and wages would be increased *only* if management prevailed in the December 20 election. The ALJ properly noted that the timing of the Company's offer and granting of increased wages and benefits raised an inference of anti-union animus. *See Grandee Beer Distributors, Inc. v. NLRB,* 630 F.2d at 932. Management's failure to rebut that inference persuasively raises serious questions about its sincerity and good faith. *Id.; NLRB v. Styletek,* 520 F.2d 275, 279 (1st Cir.1975).

■ The ALJ also correctly ruled that Section 8(a)(1) can be violated even though management does not expressly condition its promise of benefits on the outcome of a union election. In *Grandee Beer Distributors, Inc. v. NLRB,* 630 F.2d 928 (2d Cir. 1980), this Court explained that promises by management, even if implicit or subtle, would violate Section 8(a)(1) if the timing of those offers indicated a coercive purpose and effect:

16. The ALJ specifically found that this meeting took place approximately ten days to two weeks prior to the December 20, 1979 election. *See* J.App. at 18.

The promises and grant of a benefit (the wage and health plan offers) were not expressly made dependent upon the employees' rejection of the Union. Nevertheless, the timing of those offers indicated a coercive purpose and effect. *See, e.g., NLRB v. Colonial Knitting Corp.*, 464 F.2d 949 (3d Cir.1972) (granting of wage increases on eve of certification election was coercive). The company failed, in the hearings before Judge Miller, to justify the timing of the offer of benefits, as it was called upon to do to avoid the inference of anti-union action. *See NLRB v. Styletek*, 520 F.2d 275 (1st Cir.1975).

*Id.* at 932.

This Court found a coercive purpose and effect in *Grandee* when management announced on the eve of the union election that employee wages and health benefits would be increased. *Id.* The Court also found a coercive purpose and effect in *NLRB v. Charles Batchelder Co.*, 646 F.2d 33 (2d Cir.1981), when management decided, in the midst of a union organizing drive and on the eve of the election, to implement a new wage increase two months earlier than originally scheduled. *Id.* at 41.

Management's timing in this action is equally troubling. Nurse Charles testified that Director Milano called a meeting shortly before the union election and indicated during this meeting that the Company would increase wages and benefits if management won the election. Both parties concede that the Company did in fact grant wage and benefit increases on January 1, 1980, ten days after the election. The ALJ certainly could infer from this sequence of events that management had promised benefits in an effort to induce its employees to vote against the union. *See NLRB v. Charles Batchelder Co.*, 646 F.2d at 38; *Grandee Beer Distributors, Inc. v. NLRB*, 630 F.2d at 932.

There is substantial evidence to support the ALJ's finding, as adopted by the Board, that the Company violated Section 8(a)(1) of the Act when it promised and granted its employees wage and benefit increases. The Court will enforce these findings according to the terms outlined in the administrative opinion. A new election will be held at a date to be determined by the Regional Director of the Board.