## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## THALBO CORPORATION and G.B. Motel Management, d/b/a Ramada Inn Newburgh, Respondents.

### No. 98–4017.

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1998.

Decided March 16, 1999.

Sonya Spielberg, National Labor Relations Board, Washington, D.C. (Frederick Havard, Supervisory Attorney, Frederick L. Feinstein, Acting General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Washington, D.C., on the brief), for Petitioner.

Joseph A. Saccomano, Jr., White Plains, New York (Jackson, Lewis, Schnitzler & Krupman, White Plains, New York, on the brief), for Respondent.

Before: KEARSE, CARDAMONE, and POOLER, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner National Labor Relations Board ("NLRB" or the "Board") petitions for enforcement of its April 30, 1997 remedial order requiring respondents Thalbo Corporation ("Thalbo") *et al.* to pay former employee Paulette DiMilta $40,410.24, plus interest, as backpay from February 7, 1991, through July 25, 1995, for violations of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1994) ("NLRA" or the "Act"). The Board's original order finding that Thalbo violated §§ 8(a)(1) and (3) of the Act by discriminating against DiMilta because of her participation in union activities, *see Thalbo Corp.,* 314 N.L.R.B. 367 (1994) ("*Thalbo I* "), was enforced by this Court in *NLRB v. Thalbo Corp.,* 57 F.3d 1063 (2d Cir.1995) (table) ("*Thalbo II* "). Thalbo opposes enforcement of the remedial order, contending principally that any award of backpay is foreclosed (a) by collateral estoppel in light of a court suit brought by DiMilta against Thalbo under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and (b) by insufficiency of the credible evidence. Alternatively, Thalbo contends that the period for which the Board could properly order backpay ended in August 1994 or May 1995. For the reasons that follow, we reject Thalbo's contentions and grant the petition for enforcement.

## I. BACKGROUND

The facts as to Thalbo's liability for discriminating against DiMilta in violation of the NLRA have been established in *Thalbo I* and *II.* For most of the pertinent period, Thalbo and its affiliate, respondent G.B. Motel Management ("G.B.Motel") (collectively "the Company"), operated a Ramada Inn in Newburgh, New York (the "Hotel"). G.B. Motel was in charge of the bar, restaurant, and banquet rooms ("bar/restaurant operations"). As discussed in Part II.C.1. below, G.B. Motel was dissolved in 1994, and its bar/restaurant operations at the Hotel were contracted out to an entity unrelated to the Company.

DiMilta began working at the Hotel on weekdays in April 1985 primarily as a bartender. In July 1990, for medical reasons, she began an extended leave of absence, with the mutual understanding that she would, upon her recovery, be reinstated. During the approximately six months that she was on leave, she remained on the G.B. Motel payroll, though she received no salary.

As found in *Thalbo I,* while DiMilta was on sick leave, a union-organizing campaign at the Hotel began, and DiMilta was an open supporter of the union. In February 1991, following DiMilta's request to return to work, the Company refused to reinstate her. The Board, finding that the refusal was the result of DiMilta's support of the union and hence violated §§ 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3), ordered the Company to, *inter alia,* offer DiMilta

> immediate and full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed, and make her whole for any loss of earnings and other benefits suffered as a result of the discrimination against her.

*Thalbo I,* 314 N.L.R.B. at 370.

*Thalbo I* was decided in July 1994 and was enforced in *Thalbo II* in May 1995.

When satisfactory compliance had not been achieved by November 1995, the Board issued a "compliance specification," leading to a Supplemental Decision by an administrative law judge ("ALJ"), which was adopted by the Board in the April 30, 1997 remedial order at issue here, *Thalbo Corp*, 323 N.L.R.B. 630 (1997) (*"Thalbo III "*), *see* Part I.B. below.

## A. *DiMilta's Title VII Suit Against Thalbo*

In the meantime, after the Company refused to reinstate her, DiMilta commenced an action in federal district court, asserting sexual harassment claims under Title VII, along with claims under state law, against the Company and her former supervisor Helmut Rothermel for events that had occurred prior to her leave of absence (the "Title VII lawsuit"). The case was tried before a magistrate judge, who, in a decision issued in March 1995, dismissed the complaint against Rothermel but found the Company liable. *See DiMilta v. G.B. Motel Management, Inc.*, 92 Civ. 6468 (S.D.N.Y. Mar. 20, 1995) (*"DiMilta v. G.B. Motel "*).

In analyzing DiMilta's sexual harassment claims, the magistrate judge noted that in order to succeed, DiMilta was required to show that "the harassment affected a term, condition or privilege of [her] employment," *DiMilta v. G.B. Motel*, slip op. at 8 (internal quotation marks omitted), and that the harm targeted by Title VII " ' "is not limited to 'economic' or 'tangible' discrimination," ' " *id.* at 9 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986))). The magistrate judge noted that " '[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will ... *discourage employees from remaining on the job* ....' " *DiMilta v. G.B. Motel*, slip op. at 9 (quoting *Harris v. Forklift*

*Systems, Inc.*, 510 U.S. at 22, 114 S.Ct. 367) (emphasis in magistrate judge's opinion). He proceeded to find that

> Rothermel's conduct, which might have subjected him to a criminal sanction, was physically threatening and humiliating. It would have discouraged a reasonable individual from remaining on the job.... The Court is persuaded that the test for an abusive work environment has been met in this case.

*DiMilta v. G.B. Motel*, slip op. at 9.

But the magistrate judge did not find that DiMilta herself had been discouraged from remaining on the job or from seeking to return after recovery from her illness. For example, although DiMilta contended that the ailment that forced her leave of absence was caused by the stress engendered by Rothermel's sexual harassment, the magistrate judge apparently rejected that contention, as he found that "she voluntarily undertook sick leave," *id.* at 11, and concluded that she therefore was "not entitled to back pay for the period of time that she was disabled and unable to work because she would not have been entitled to her salary during this time," *id.* at 12.

Further, the magistrate judge found that Rothermel's sexual harassment was not the reason DiMilta did not return to work at the Hotel. He noted that "in most cases the victim of this type of behavior would not be eager to return to working for the same errant supervisor"; in this case, however, DiMilta, believing the circumstances would eventually be changed or could be controlled, wanted to return to work. *Id.* at 7 n. 9. Nor was the sexual harassment related to Thalbo's refusal to reinstate DiMilta. The magistrate judge found that "the reason for Defendant's failure to rehire her stemmed from her employer's retaliation for activity protected by federal labor law and not from Rothermel's pique." *Id.* at 7 n. 7; *see also id.* at 8 ("[T]he reprisal visited upon [DiMilta] in the form of not being rehired was not the result of Plaintiff's reaction to Rothermel's conduct, but rather stemmed from her em-

ployer's reaction to her union organizing efforts.").

In sum, the magistrate judge did not find that DiMilta was constructively discharged, for he did not find that she had left her job at the Hotel as a result of the sexual harassment, or that she had been loath to seek reinstatement, or that the refusal to reinstate her had any relationship to sexual harassment. Nor did he find that while working at the Hotel she had suffered any diminution in her compensation as a result of the sexual harassment.

Nonetheless, in fashioning relief for the abusive work environment it found had existed, the court awarded DiMilta what it termed "back pay," *e.g., id.* at 12, 13, for a period beginning with Thalbo's denial of reinstatement and ending in August 1991 when DiMilta found work as a bartender at a military academy bar called the Stewart Officers' Club ("Stewart"). DiMilta's job at Stewart lasted only until October 1992, when she was laid off. The magistrate judge concluded that no award was appropriate for the period following her layoff at Stewart, in light of a deposition given by DiMilta in the lawsuit, in which she stated in part as follows:

Q Besides the job at Stewart ..., have you had any other jobs since you left Ramada?

A No.

Q And why did you leave that job at Stewart?

A At Stewart, my husband and I had a deal that when I turned 45, I can retire. I just pushed it up six months.

Q So, is it fair to say that you are in retirement at this point?

A Yes.

(Deposition of Paulette DiMilta, February 9, 1993, at 48.) The magistrate judge stated that, as to the period following DiMilta's employment with Stewart, her

> deposition testimony supports the conclusion that since then she has not been aggressive in seeking another job because, through an arrangement with her husband, she is currently in retirement, a retirement the commencement of which coincides with the layoff in October 1992.

*DiMilta v. G.B. Motel,* slip op. at 12.

The district court concluded that DiMilta should receive "back pay" measured with reference to what she would have earned at the Hotel for the period from February 8, 1991, through August 1991. Making a rough approximation of those earnings, and exercising discretion to make adjustments for what it viewed as anomalies or uncertainties, the court concluded that an appropriate award for the Title VII sexual harassment claim was $7,521. The court also awarded $1,000 under N.Y. Exec. Law § 296 (McKinney 1993) for emotional distress. The Company paid the judgment.

### B. The Compliance Specification and the Remedial Order

As discussed in greater detail in Part II.C.2. below, in late May 1995, Thalbo sent DiMilta notice of an opening for a desk clerk at the Hotel. Upon contacting the Hotel's manager, DiMilta learned that the position would require her to work principally nights on weekends rather than days during the week, would pay her wages below the compensation she had previously earned as a Hotel bartender, and that her previously accrued seniority and other benefits would not be honored. DiMilta declined to take the position.

On July 25, 1995, Thalbo advised DiMilta of a desk clerk position principally for weekdays, at a wage level closer to her prior compensation. DiMilta initially accepted the July 1995 position, though she soon thereafter rescinded her acceptance in order to take a job with another company.

In November 1995, the Board's regional director issued a compliance specification seeking an order directing the Company to

pay DiMilta backpay for the period February 7, 1991, to July 25, 1995, reduced by DiMilta's earnings from Stewart and the amounts awarded in the Title VII lawsuit. Thalbo objected to any award of backpay, contending that such an award was foreclosed either by principles of collateral estoppel as a result of the judgment in the Title VII lawsuit or by DiMilta's testimony in that case that she had retired in October 1992. Alternatively, Thalbo contended that the backpay period should be shorter than that sought by the regional director, either because G.B. Motel was dissolved in August 1994 or because Thalbo offered DiMilta reinstatement in May 1995.

At the administrative hearings as to the amount of backpay due, DiMilta testified that her responses in the lawsuit deposition that she had "retired" in 1992 were not true and had largely been the result of nervousness at having her deposition taken and being forced to describe her supervisor's licentious acts. The evidence at the administrative hearings also included testimony by DiMilta describing her efforts to find work after being laid off at Stewart, along with more than 80 pages of written records showing the names of employers she contacted from September 1992 to July 1995. Thalbo presented evidence with regard to the 1994 dissolution of G.B. Motel and the transfer of Hotel bar/restaurant operations to a different company.

Following the hearings, the ALJ issued the supplemental decision adopted in *Thalbo III*, rejecting all of the Company's objections. The ALJ dismissed Thalbo's collateral estoppel argument on the principal ground that the NLRB had not been a party to the Title VII action and therefore could not be bound by the district court's rulings. The ALJ noted that "Board law is clear and consistent [that] .... [t]he Board is not precluded from litigating an issue involving the enforcement of the National Relations Act that a private party has litigated unsuccessfully, when the Board was not a party to the private litiga-

tion." *Thalbo III*, 323 N.L.R.B. at 634. The ALJ explained that this position

is premised on Section 10(a) of the Act which sets forth that the Board's power to prevent unfair labor practices "shall not be affected by any other means of adjustment or prevention that had, [*sic*] has been or may be established by agreement, law, or otherwise," [29 U.S.C. § 160(a),] as well as the long-recognized principle that "[']Congress has entrusted to the Board exclusively the prosecution of the proceeding by its own complaint, the conduct of the hearing, the adjudication and the granting of appropriate relief. The Board, as a public agency acting in the public interest, not any person or group, not any employee or group of employees, is chosen as the instrument to assure protection from the described unfair conduct in order to remove obstructions to interstate commerce.[']" *Field Bridge[ Associates*, 306 N.L.R.B. 322 (1992), *enforced sub nom. Local 32B–32J Service Employees International Union v. NLRB*, 982 F.2d 845 (2d Cir.), *cert. denied*, 509 U.S. 904, 113 S.Ct. 2995, 125 L.Ed.2d 689 (1993) ], citing *Amalgamated Utility Workers v. Consolidated Edison Co.*, ... 309 U.S. [261, 265, 60 S.Ct. 561, 84 L.Ed. 738] (1940).

*Thalbo III*, 323 N.L.R.B. at 634.

Turning to the evidence as to DiMilta's job-search efforts, the ALJ found that it was "reasonable that [DiMilta] may have been so upset at having to testify about the serious and humiliating incidents of sexual harassment, that she may have not been fully concentrating on her answers." *Id.* at 636 (footnote omitted). The ALJ found that DiMilta had not in fact left the job market, as he credited her testimony with regard to her efforts to find new work after being laid off at Stewart, noting that that testimony was supported by her extensive records. He concluded that the Company had not carried its burden of showing that DiMilta failed to make a

"reasonable good-faith effort to find jobs." *Id.* at 635–36.

For the reasons discussed in Part II.C. below, the ALJ also rejected the Company's contentions that the backpay period ended prior to July 1995. The total backpay award, after giving Thalbo credit for the amounts earned by DiMilta at Stewart and the amounts awarded in the Title VII lawsuit, was $40,410.24. This petition for enforcement followed.

## II. DISCUSSION

In opposition to the petition for enforcement, Thalbo principally pursues its contention that because of collateral estoppel, DiMilta is entitled to no backpay. It also contends that no such award is justified by the credible evidence before the ALJ, and it pursues its alternative contentions that the backpay period should have been shorter. For the reasons that follow, we reject all of Thalbo's contentions.

### A. *Issue Preclusion*

■ Urging application of collateral estoppel, Thalbo contends that the Board could not properly award any backpay to DiMilta for the period following the termination of her employment at Stewart because the district court in *DiMilta v. G.B. Motel* found that when her employment at Stewart ended, DiMilta retired. The Board, in opposition, contends that "if the Board was not a party to prior private litigation, it is not barred from litigating an issue involving enforcement of federal law which the private party has litigated successfully." (NLRB appellate brief at 25.) Without adopting so broad a rule, we conclude that there was no estoppel in this case.

■ Under general principles of collateral estoppel, or issue preclusion, a judgment in a prior proceeding bars a party and its privies from relitigating an issue if, but "only if:"

(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Local 32B–32J Service Employees International Union v. NLRB*, 982 F.2d 845, 849 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 509 U.S. 904, 113 S.Ct. 2995, 125 L.Ed.2d 689 (1993); *see generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416, at 137–38 (1981) ("Wright, Miller & Cooper"). If the issues were not identical, there is no collateral estoppel. *Compare Local 32B–32J Service Employees International Union v. NLRB*, 982 F.2d at 849–50 (no collateral estoppel where issue in court proceeding had been whether part of contract had been assumed, whereas issue before the Board was whether the entire contract had been assumed), *with NLRB v. Donna–Lee Sportswear Co.*, 836 F.2d 31, 34 (1st Cir.1987) (collateral estoppel applied where issue in both proceedings was existence of contract). Nor is litigation of an issue barred by collateral estoppel if that issue was not actually decided in the prior proceeding or if its decision was not ·necessary to the judgment. *See, e.g., Brown v. Felsen*, 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Balderman v. United States Veterans Administration*, 870 F.2d 57, 62 (2d Cir.1989). In the present case, even aside from the special considerations that may counsel against application of preclusion doctrines against a governmental agency seeking to enforce federal law, *see, e.g., United States v. East Baton Rouge Parish School Board*, 594 F.2d 56, 58 (5th Cir.1979) (claim preclusion); Wright, Miller & Cooper § 4458, at 512–13, 520–21, we cannot conclude that issue preclusion is applicable, for we find most of the prerequisites lacking.

First, the principle that preclusion is applicable only against one who was a party to the prior proceeding, or was in

privity with such a party, is designed to insure that one not be foreclosed from litigating an issue unless its interests were in a meaningful sense represented in the prior proceeding. *See, e.g., Chase Manhattan Bank, N.A. v. Celotex Corp.,* 56 F.3d 343, 346 (2d Cir.1995). The interests of a private litigant in a Title VII action are not usually the same as the interests of the NLRB in an unfair-labor-practice proceeding. The Title VII claimant seeks redress for employment discrimination on the basis of "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2. The goal of an individual claimant is generally the vindication of the personal right to be free from such discrimination, and the responsibility of a court that finds such a violation is to fashion equitable relief to make the claimant whole, *see, e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–19, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

■ In contrast, the NLRB's province is primarily the relationships between employers and unions as those relationships affect employees, and its interest in a case such as this concerns an employer's unfair practices that are designed to discourage employees from joining a union. Congress's "primary purpose" in enacting the NLRA was "to stop and to prevent unfair labor practices," *Shepard v. NLRB,* 459 U.S. 344, 352, 103 S.Ct. 665, 74 L.Ed.2d 523 (1983) (internal quotation marks omitted); *see* 29 U.S.C. § 160(a) ("Board is empowered ... to prevent any person from engaging in any unfair labor practice"), and the Board's power to order affirmative relief in favor of an individual victim is "merely incidental" to that purpose, *Shepard v. NLRB,* 459 U.S. at 352, 103 S.Ct. 665 (internal quotation marks omitted). *See, e.g., Vaca v. Sipes,* 386 U.S. 171, 182–83 n. 8, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) ("The public interest in effectuating the policies of the federal labor laws, not the wrong done the individual employee, is always the Board's principal concern in fashioning unfair labor practice reme-

dies."). The Board has broad discretion in fashioning remedies to achieve Congress's purposes, *see, e.g., Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 898–99, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and after finding an unfair labor practice, it may permissibly determine that an appropriate remedy does not include complete relief to an unfair-labor-practice victim, *see Shepard v. NLRB,* 459 U.S. at 351–52, 103 S.Ct. 665. Thus, while at some point the interests of a Title VII claimant and the Board may intersect, neither in subject matter nor in scope are their interests congruent.

■ Second, it does not appear that the issue relevant here was actually decided in the Title VII lawsuit. As discussed in Part II.B. below, DiMilta's entitlement to backpay here depended on whether she made reasonable efforts to find work in the wake of her layoff at Stewart. The magistrate judge in the Title VII action stated that DiMilta was "in retirement," *DiMilta v. G.B. Motel,* slip op. at 12, and was not entitled to backpay for the period during her retirement. But "retirement" is a conclusory concept that does not preclude the possibility that the "retiree" was making reasonable efforts to find work. *See, e.g., Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 168 (2d Cir.1998) (backpay period properly cut off at retirement date where jury found that plaintiff did not " 'make a diligent search for other work in the period after he *retired* ' " (quoting special verdict question) (emphasis in *Kirsch* )); *Nordstrom v. NLRB,* 984 F.2d 479, 482 (D.C.Cir.1993) (letter of retirement did not cut off right to backpay where employee continued to search for jobs). In the Title VII lawsuit, the magistrate judge did not actually find that, after being laid off by Stewart, DiMilta did not make a reasonable effort to seek other work. Rather, the magistrate judge stated that "she has not been *aggressive* in seeking another job," *DiMilta v. G.B. Mo-*

*tel*, slip op. at 12 (emphasis added), leaving as a negative pregnant the possibility that DiMilta in fact made reasonable job searches, just not aggressive ones.

Third, even assuming that the magistrate judge actually found that DiMilta did not seek other work after being laid off at Stewart, it appears for various reasons that such a finding was not necessary to the judgment. As indicated, the magistrate judge apparently considered that further relief would be unwarranted for a claimant who had sought other jobs but had not done so "aggressively." The only finding essential to that proposition was that DiMilta's pursuit of job opportunities was not "aggressive." An additional finding that she did not search at all would have been, under the standard used by the district court, superfluous.

 Further, Thalbo had violated different statutes by engaging in two unrelated categories of misconduct, resulting in different injuries, and each proceeding dealt exclusively with one set of harms and not the other. In the Title VII case, Thalbo was found liable for Rothermel's sexual harassment of DiMilta. Although the Title VII compensation awarded to DiMilta by the district court was calculated by approximating what she would have earned at the Hotel, and that award was called "back pay" by the magistrate judge, it does not appear that that award was properly so characterized, for the magistrate judge did not find that the sexual harassment caused any loss or diminution of earnings. Rather, he rejected DiMilta's contention that she had been forced to leave work in July 1990 because of the tension caused by Rothermel's harassment, concluding that she was not entitled to any compensation for the period during which she was on leave; and he found that Thalbo's denial of reinstatement was unrelated to the sexual harassment. Sexual harassment in violation of Title VII can, of course, be established without a showing of economic injury, *see, e.g., Meritor Savings Bank, FSB v. Vinson*, 477 U.S. at 64–65,

106 S.Ct. 2399. But prior to the 1991 amendments to Title VII, codified at 42 U.S.C. § 1981a (1994), which became effective in November 1991 (which were not retroactive, and hence were not applicable to DiMilta), an invidiously harassed claimant who resigned without being constructively discharged, could not be awarded backpay. *See, e.g., Landgraf v. USI Film Products*, 511 U.S. 244, 248–49, 283, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("In cases like this one," in which "Landgraf voluntarily resigned from her employment with USI for reasons unrelated to the sexual harassment in question," the "prior law afforded no relief." (internal quotation marks omitted)).

The magistrate judge granted DiMilta a monetary award for sexual harassment despite having found that she did not leave her job at the Hotel because of that harassment, was not reluctant to return to work there, and was not denied reinstatement as a result of or in furtherance of the harassment. In these circumstances, in light of the limited relief available under Title VII as it applied to DiMilta's case, it is difficult to fathom the Title VII relevance of DiMilta's post-Stewart status in the job market. A finding as to whether or not she looked for work was not necessary for a determination of the compensation she should be awarded for conduct that was found not to have had any effect whatever on the continuation of her employment.

For all of the above reasons, the application of collateral estoppel against the Board in this case would be inappropriate.

### B. *Sufficiency of the Evidence*

 Thalbo also contends that "DiMilta should not be awarded backpay because the *credible* evidence presented at the hearing established that she retired from her position at ... Stewart," arguing, *inter alia*, that her testimony that she had been laid off at Stewart was "untruthful" and that her administrative hearing testimony explaining her deposition statements that

she had retired was *"incredible."* (Thalbo appellate brief at 26, 27 (emphases in original).) Giving due regard to the substantive law, the administrative record, and the proper standard of review, we reject these contentions.

■ A victim of a discriminatory labor practice who seeks backpay has an obligation to have mitigated her damages due to lost wages, *see Sure–Tan, Inc. v. NLRB*, 467 U.S. at 901, 104 S.Ct. 2803, for " 'a discriminatee is not entitled to back pay to the extent that he fails to remain in the labor market,' " *Kirsch v. Fleet Street, Ltd.*, 148 F.3d at 168 (Age Discrimination in Employment Act case) (quoting *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 174 n. 3 (2d Cir.1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966)). *See, e.g., Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 198, 199–200, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (employee must not have "willfully incurred" a loss of earnings such as by engaging in a "clearly unjustifiable refusal to take desirable new employment"). In order to mitigate, it is sufficient that the employee make "honest good faith effort[s]" and use "reasonable diligence" to find comparable work. *Heinrich Motors, Inc. v. NLRB*, 403 F.2d 145, 149 (2d Cir.1968) (internal quotation marks omitted). A backpay claimant's duty to "mitigate her damages by using 'reasonable diligence in finding other suitable employment' .... is not onerous, and does not require [her] to be successful in mitigation." *Dailey v. Societe Generale*, 108 F.3d 451, 455–56 (2d Cir.1997) (Title VII case) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)) (other internal quotation marks omitted); *accord Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 800 (4th Cir.1998). The employer has the ultimate burden of proving that the discriminatee failed to mitigate damages. *See, e.g., Heinrich Motors, Inc. v. NLRB*, 403 F.2d at 148; *NLRB v. Mastro Plastics Corp.*, 354 F.2d at 175, 178–79.

■ On appellate review, the Board's findings of fact will not be overturned if they are supported by "substantial evidence on the record considered as a whole, taking into account whatever in the record fairly detracts from its weight, but giving due regard to the Board's expertise." *NLRB v. American Geri–Care, Inc.*, 697 F.2d 56, 59–60 (2d Cir.1982) (internal quotation marks omitted), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It is not within our province to reverse the Board's findings simply because our evaluation of the evidence may differ from that of the Board.

■ Under this standard, "reversal based upon a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *NLRB v. Katz's Delicatessen*, 80 F.3d 755, 763 (2d Cir.1996) (internal quotation marks omitted). When the Board's findings are based on the ALJ's assessment of the credibility of the witnesses, they will not be overturned unless the testimony is " 'hopelessly incredible' " or the findings " 'flatly contradict' either the 'law of nature' or 'undisputed documentary testimony.' " *NLRB v. J. Coty Messenger Service, Inc.*, 763 F.2d 92, 96 (2d Cir.1985) (quoting *NLRB v. American Geri–Care, Inc.*, 697 F.2d at 60); *see, e.g., NLRB v. Gordon*, 792 F.2d 29, 32 (2d Cir.), *cert. denied*, 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986).

Thalbo's contention that DiMilta was not in fact laid off at Stewart need not detain us long. Thalbo called as a witness Armond DiPoalo, manager of the Stewart club, who testified that DiMilta had worked on an "on-call" basis as a "flex" employee. Although DiPoalo testified that

DiMilta had not been laid off, he also testified that after September 1992 the bar manager in charge of scheduling flex employees stopped calling DiMilta for work, that DiPoalo did not know why DiMilta was no longer called for work, that he had never discussed that matter with the bar manager in charge of the work schedule, and that DiMilta never told DiPoalo that she was quitting. DiMilta testified that she had not voluntarily stopped working at Stewart; she had stopped only when a manager informed her that she was being laid off. Thereafter, she collected unemployment insurance. This constituted substantial evidence that DiMilta had in fact been laid off at Stewart, and it was well within the Board's province to reject DiPoalo's testimony that she had not been laid off.

The record at the administrative hearing also contains substantial evidence to support the Board's findings that in fact DiMilta made reasonably diligent efforts to find work after being laid off at Stewart. DiMilta testified that at all times after the Company refused to reinstate her she had searched diligently for another job, and her testimony was supported by detailed records she had kept as to her search. The Board had instructed DiMilta to keep records of her job search efforts, and she did so by noting the names of employers she had contacted on state forms used in connection with applications for unemployment insurance. The documents introduced at the administrative hearing included some 82 pages containing the names of employers DiMilta had contacted from September 1992 to July 1995. They indicated that DiMilta usually contacted at least five employers a week during that period.

Thalbo has not called to our attention any evidence in the record that cast doubt on the accuracy or veracity of DiMilta's records. Its contention that DiMilta had not made the requisite efforts to find work was based solely on her deposition testimony in the Title VII lawsuit, stating that after leaving Stewart she had retired. The Board credited DiMilta's explanations as to why that deposition testimony was not true. DiMilta explained at the administrative hearings that her statement in the lawsuit deposition that she had retired in 1992 was flippant and not accurate, and had resulted from her nervousness at the prospect of being forced to detail Rothermel's sexual misconduct. She also testified that she had not given her Title VII attorney her job-search documents (which were not introduced or even mentioned in her Title VII trial) because he had advised her that her post-Stewart job efforts were not relevant to her Title VII claims (an assessment that was hardly unreasonable, given that the sexual harassment had had no effect on the continuation or resumption of her employment). The Board was entitled to credit DiMilta's testimony at the administrative hearing that she had not in fact removed herself from the job market, especially since her testimony as to her extensive job search efforts was thoroughly documented. While the Board could have rejected DiMilta's explanations for her deposition statements, her testimony at the administrative hearing was not "hopelessly incredible" and did not contradict either the "law of nature" or the documentary evidence.

Accordingly, the Board's credibility determination may not be overturned, and we conclude that there was substantial evidence in the record to support a finding that DiMilta made reasonably diligent efforts to find work after being laid off at Stewart and to support the ruling that Thalbo did not carry its burden of proving that she did not make such efforts.

C. *Thalbo's Arguments for Limitation of the Backpay Period*

1. *The 1994 Dissolution of G.B. Motel*

 Thalbo contends that, even if it is liable to pay some backpay, that obligation should have been found to end in August 1994 when G.B. Motel, the entity that had operated the Hotel's bar during DiMilta's

employ, was dissolved and Thalbo contracted out the Hotel's bar/restaurant operations to Carol Davino Enterprises, Inc. ("Davino"), a company unrelated to Thalbo. Thereafter, none of the employees at the bar were on Thalbo's payroll, and Davino had complete discretion to hire employees of its choosing.

The ALJ rejected the contention that these events ended the backpay period, noting that Thalbo itself remained obligated "to offer [DiMilta] a substantially equivalent position of employment at other jobs at the hotel." *Thalbo III*, 323 N.L.R.B. at 637. In addition, noting testimony by a Thalbo official that Davino had in fact hired some of G.B. Motel's restaurant and banquet employees and both of G.B. Motel's bartenders, the ALJ found it "probable that had DiMilta not been discriminatorily terminated by [the Company], . . . she would have been hired by Davino after Davino began operating . . . the bar, where DiMilta had been employed." *Id.* The record supports these findings, and we see no error in the refusal to cut off the backpay period in 1994.

Thalbo's reliance on *Williams Motor Transfer, Inc. v. Larose*, 284 N.L.R.B. 1496 (1987), is misplaced. That case involved an original employer that had violated the NLRA, and the issue for that opinion was whether a successor employer was liable for the original employer's violation, *see id.* at 1504; the decision did not deal with the extent of the original employer's backpay obligation, *see id.* at 1497 (question of "appropriate scope of the backpay period" reserved for "future compliance proceedings"). The present matter is entirely different. There is no question as to any alleged liability of Davino, which took over G.B. Motel's operations. Further, Thalbo and G.B. Motel were, for NLRA purposes, a single entity, *see Thalbo I*, 314 N.L.R.B. at 367 & n. 3, and only G.B. Motel was dissolved. Thalbo remains in business and remains responsible to answer for its violations of the Act.

### 2. *The May 1995 "Offer" of Reinstatement*

 Nor is there merit in Thalbo's contention that its liability for backpay ended in May 1995 on the ground that at that time it made an offer of reinstatement. The ALJ found that Thalbo's May 1995 letter to DiMilta with regard to the availability of a desk-clerk position did not constitute a valid offer of reinstatement because the letter merely notified DiMilta of an open position and did not express an unequivocal offer for employment. *See, e.g., Holo–Krome Co. v. NLRB*, 947 F.2d 588, 595 (2d Cir.1991) (to be valid, an offer of reinstatement must be specific, unequivocal, and unconditional); *NLRB v. Transport Service Co.*, 973 F.2d 562, 572 (7th Cir.1992); *John Cuneo, Inc. v. NLRB*, 792 F.2d 1181, 1183 (D.C.Cir.1986) (per curiam). The ALJ also found that the position described in the May 1995 letter was not "substantially equivalent" to DiMilta's previous position at the Hotel. We see no error in these findings.

First, the body of Thalbo's letter to DiMilta, signed by the Hotel's manager and dated May 26, 1995, stated *in toto* as follows:

> We have an immediate opening at our front desk for a desk clerk. The position will be Friday, Saturday, Sunday and one additional day during the week. It will be either A shift or B shift. . . . A shift is 7:00am [*sic*] to 3:00pm, B shift is 3:00pm to 11:00pm. As I have this opening now I need an immediate response. The position starts [*sic*] Tuesday May 23 [*sic*], 1995 for training.
>
> Please call me at the hotel 564–4500.

The text of the letter itself supports the Board's finding that this was not an unequivocal offer of the position to DiMilta.

Second, *Thalbo I* ordered the Company to, *inter alia*, offer DiMilta "reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously

enjoyed." 314 N.L.R.B. at 370. The position announced by the Company's May 26, 1995 letter did not meet these requirements. The evidence presented at the administrative hearing revealed that the position described by Thalbo in that letter would have paid DiMilta wages of $6.00 per hour, whereas her former wages plus tips averaged $7.38 per hour. Further, DiMilta was informed that she would be required to work weekends, whereas she had originally worked Mondays through Thursdays, and to work evening and night shifts exclusively, whereas her original position generally involved day shifts. *See, e.g., Waterbury Hospital v. NLRB*, 950 F.2d 849, 856 (2d Cir.1991) (employer's offer for reinstatement was not for substantially equivalent positions where the discharged employees "were offered only evening shifts instead of their prestrike day shifts"). And despite DiMilta's explicit reminder to the Company that *Thalbo I* ordered that she be offered a position "without prejudice to her seniority," Thalbo insisted that DiMilta would be treated as a new employee with no seniority.

Plainly, Thalbo's May 1995 letter notifying DiMilta of the desk clerk opening could not cut off its liability for backpay.

## CONCLUSION

We have considered all of Thalbo's arguments in opposition to enforcement of the Board's remedial order of April 30, 1997, and have found them to be without merit. The petition for enforcement is granted.