[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Department of Corrections ("the Department"), appeals from a decision of August 24, 1998, and a supplemental decision of June 29, 1999, rendered by a hearing officer of the defendant, Commission on Human Rights and Opportunities Commission ("CHRO") in favor of the CT Page 13526 defendant Barbara Hawkins.
The court summarizes below the comprehensive factual findings of the hearing officer in its August 24, 1998 decision. (Return of Record ("ROR"), Volume 1, Item 2.)
1. Barbara Hawkins is an African-American woman.
2. Since November 1989, Hawkins has been employed by the Department at its maximum security facility in Somers, Connecticut.
3. The Department does not dispute that Hawkins' job evaluations dated January 8, 1990 and April 25, 1991 were satisfactory.
4. Prior to assuming the duties of a corrections officer, Hawkins received intensive training at an academy program and was provided a copy of the Department's employee handbook.
5. Prior to 1993, the Department's employee handbook directed employees to "avoid undue familiarity with inmates."
6. Hawkins interpreted this provision to apply only to staff and inmates while they were at the same institution or correctional facility.
7. Hawkins' conclusion was reasonably based on past practices at Somers which allowed inmates and employees from separate institutions to pursue personal relationships on the premises. Her belief was further buttressed by a change in 1993 to the employee's handbook, prohibiting personal relationships between inmates and employees located at the same and separate facilities.
8. The administration of Somers encouraged correction officers to develop a rapport with inmates in order to gain the inmates trust with the guards and obtain valuable, reliable information, especially information pertaining to security.
9. In October of 1990, Hawkins met Alexander Cruz, an inmate at Somers, when he was released from segregation following a riot and transferred into Hawkins' unit in H block.
10. Cruz was president of a gang at Somers known as the Latin Kings.
11. Captain Federico directed Hawkins to gain information from both Cruz and the president of another gang, Los Solidos, which was passed onto Federico. CT Page 13527
12. Cruz was stabbed by a member of his gang, who overheard Cruz passing on information to Hawkins, and was terminated from the Latin Kings. Cruz was transferred by the Department in January 1992 to a correctional facility in Hartford.
13. After the transfer, through the "matchmaking" of another corrections officer, Hawkins visited Cruz at the correctional facility in Hartford. Thereafter, Hawkins met Cruz at Bulkeley High School when he was out of jail on an educational pass and while on furlough, Hawkins drove Cruz to his brother's home in New Haven.
14. From March 1992 to March 1994, for approximately two years, Hawkins and Cruz were romantically involved.
15. In 1992, the administrative directive allowed the inmate to initiate a request for a furlough. Hawkins never filled out any forms as sponsor of Cruz on furlough. Until the rule was subsequently changed, the practice was to allow the inmate to "walk out the door" and anyone could pick him/her up.
16. As a result of inmates and employees at Somers learning of the Hawkins-Cruz relationship, she decided to disclose to Somers Warden Tilghman the nature of the relationship.
17. At the same time, Hawkins was aware of the relationship between correction officer Nellie Delgado and an inmate, Charles Thompson. Because of Delgado's and Thompson' relationship, Delgado was transferred to another facility. Hawkins personally observed Delgado visit him in the visiting room at Somers, holding hands, kissing and hugging. Delgado is an Hispanic female. Delgado and Thompson were married at the Somers' visiting room with Hawkins present. Delgado gave birth to a baby. Delgado remains employed by the Department. Delgado was not disciplined for a violation of undue familiarity policies.
18. Hawkins knew of two other "undue familiarity" incidents without discipline, one involving an emotional relationship between a correctional officer and an inmate at Somers and another involving a Department nurse visiting an inmate at Cheshire.
19. The meeting between Hawkins and Warden Tilghman occurred on April 15, 1992. Tilghman reacted to the Hawkins-Cruz relationship by stating that what she did outside the gates of Somers was her own business and that his main concern was Hawkins' job performance. She was not told she was violating any Department policy or that she was engaged in any wrongdoing. CT Page 13528
20. On May 22, 1992, without any advance notice, Hawkins was relieved of her duties and after two "Laudermill" hearings placed on administrative leave with pay. On July 10, 1992, Hawkins was terminated from state employment for sponsoring an inmate (Cruz) at another facility on several weekend furloughs in violation of the "undue familiarity" provision of the employee handbook.
21. After Hawkins filed a union grievance, an agreement was reached and she was reinstated, with her dismissal changed on her record to an unpaid disciplinary suspension from July to December, 1992. At the same time, Hawkins filed a complaint with CHRO alleging discrimination.
22. During the "Laudermill" hearings and the grievance procedure, Cruz's gang status was not mentioned. His gang status was first raised at the public hearing phase.
23. The hearing officer discusses several situations at Somers where "undue familiarity" was claimed. In one case, a female employee had a relationship with an inmate, resigned from state service and married him. In another situation, a black female employee was fired for having a relationship with an inmate, mostly likely at the same institution. Three black males officers provided favors for inmates and one was demoted from captain, but not terminated. Two female librarians resigned to marry inmates. A Hispanic female employee was suspended for five days for borrowing a cassette tape from an inmate. Another was suspended for three days for exchanging gifts with an inmate.
24. The hearing officer concluded that the Department "disciplined some males and some females of all races but the discipline imposed on Hawkins [and the other terminated officer], both black females . . . was more severe than the discipline imposed on men and white and Hispanic women for comparable or worse offenses."
25. The hearing officer found that during her five-month period of unemployment, Hawkins did not attempt to obtain another job because most of Hawkins' time was spent researching and interviewing in order to win unemployment compensation and as union grievance. Hawkins spent more than twenty hours per week at law libraries. She had to direct the union officials in arguing her grievance. She did admit that she could have found a job, but denied that it would have had equal pay or benefits.
Based upon these findings of fact, the hearing officer concluded that in an effort to reinvigorate enforcement of its "undue familiarity" rule, the Department had sought to make an example of Hawkins and terminated her from employment because she was a black female. In her CT Page 13529 supplemental decision of June 30, 1999, the hearing officer order the Department to pay back pay in the amount of $15,506.36. (ROR, Volume 1, Item 1.) Back pay was calculated by subtracting from the gross back pay figure, $24,034.36, the unemployment compensation benefits, $8,528, received by Hawkins.
The Department timely appealed the August 24, 1998 decision but it was dismissed for lack of a final judgment since the decision did not set forth an exact amount of money damages. Thereafter, a supplemental decision was issued on June 30, 1999, which included a sum certain award of money damages. The plaintiff timely appealed to this court on August 10, 1999. Because the Department is ordered to pay damages to Hawkins and comply with other orders, the court finds that the Department is aggrieved for purposes of appeal.
The first issue raised by the Department on appeal is whether the hearing officer erred in allowing the gender discrimination case to proceed, after Hawkins amended her CHRO complaint deleting that claim.[1]
Hawkins' original CHRO complaint dated January 6, 1993, alleged discrimination based on race and gender. On January 19, 1993, an amended complaint was filed, omitting the gender discrimination claim. This amended complaint was investigated and after conciliation efforts failed, was certified to a public hearing on February 28, 1994. On March 6, 1995, Hawkins again amended her CHRO complaint adding a claim of gender discrimination. In her final decision, the hearing officer held that the March 6, 1995 amendment was proper, (ROR, Volume 1, Item 2, p. 23.), and concluded that the Department had engaged in gender discrimination. (ROR, Volume 1, Item 2, p. 37.)
The Department argues that the viable complaint, which proceeded through investigation and was certified to the CHRO executive director under General Statutes § 46a-84(a), was the amended complaint of January 19, 1993, which did not set forth a claim of gender discrimination. Therefore, the Department concludes:."In this case, it is clear that the only complaint investigated and certified for public hearing was [Hawkins'] claim of racial discrimination. . . . [T]he addition of a sex discrimination claim in April 1995 was accepted by the hearing officer more than two years after the filing of the original complaint and nearly three years after the allegedly discriminatory acts took place, thereby allowing [Hawkins] to add a claim more than two years beyond the expiration of the applicable statute of limitations." (Emphasis in original.) (Plaintiff's Brief, pp. 13, 15.)
In the present case, the hearing officer had jurisdiction to consider the amended complaint, which added a claim of gender discrimination. The Department does not claim that the March 6, 1995, complaint placed new CT Page 13530 allegations before CHRO. By amending her complaint, Hawkins merely added a second legal conclusion to the facts as already developed prior to the certification by the investigator for CHRO. The CHRO statutory provision and regulations allow for "reasonable amendments" after the appointment of a presiding officer and do not require further agency investigation. General Statutes § 46a-84(g); Regs., Conn. State Agencies § 46a-54-90(e).
Both parties refer to federal case law interpreting Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.[2] The general policy considerations applied by the courts in claims brought under Title VII are to avoid imposing overly-technical restrictions on Title VII plaintiffs while at the same time preventing the development of charges not encompassed in the EEOC charge to the detriment of the employer. 4 Cook-Sobiecki, Civil Rights Actions, p. 21-264, ¶ 21.20[B]. The leading case, Sanchez v. Standard Brands, Inc., 431 F.2d 455,464 (5th Cir. 1970), holds that "[t]he selection of the type of discrimination alleged . . . is in reality nothing more than the attachment of a legal conclusion to the facts alleged. In the context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations."[3]
In Sanchez, the Fifth Circuit also held that a Title VII complaint "`may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission. . . . In other words, the `scope' of the judicial complaint is limited to the `scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." (Emphasis added; internal quotation marks omitted.)Sanchez v. Standard Brands, Inc., supra, 431 F.2d 466, quoting King v.Georgia Power Company, 295 F. Sup. 943, 947 (N.D.Ga. 1968). The above decision clearly supports the conclusion of the hearing officer to allow the amendment adding a claim of gender discrimination. Hawkins was properly allowed to pursue an additional type of discrimination based upon the facts as investigated and as developed before her hearing commenced.[4]
The Department next contests the hearing officer's conclusion that the Department engaged in a discriminatory practice by terminating Hawkins and challenges the hearing officer's application of the test set forth inMcDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Ann Howard'sApricot's Restaurant v. Commission on Human Rights and Opportunities,237 Conn. 209 (1996).
Of course such an argument must be evaluated by this court based upon CT Page 13531 the substantial evidence test. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Citations omitted.) Adriani v. Commission on HumanRights and Opportunities, 220 Conn. 307, 315 (1991).
 The scope of permissible review is governed by § 4-183(j) and is very restricted. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the [agency]. . . . The conclusion reached by the [agency] must be upheld if it is legally supported by the evidence. . . . The credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency, and, if there is evidence . . . which reasonably supports the decision of the commissioner, we cannot disturb the conclusion reached by him. . . . Our ultimate duty is to determine, in view of all the evidence, whether the agency, in issuing its orders, acted unreasonably, arbitrarily, illegally or in abuse of discretion.
(Citations omitted; internal quotation marks omitted); Billings v. CHRO,18 Conn. App. 241, 244 (1989): "The ultimate duty of the trial court was to decide whether, in light of the evidence, the agency had acted unreasonably, arbitrarily, illegally or in abuse of its discretion;"O'Callaghan v. Commissioner of Social Services, 53 Conn. App. 191, 203
(1999):
 Judicial review of the decision of an administrative agency is limited. [W]e must decide, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily or illegally, or abused its discretion. . . . Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Burinskas v. Department of Social Services, 240 Conn. [141,] 146-47 [(1997)]. (Citations omitted; internal quotation marks omitted.) CT Page 13532
The parties agree that under McDonnell Douglas and Ann Howard's, the plaintiff must establish a prima facie case by a preponderance of the evidence. In order to establish a prima facie case of discrimination, the plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for the position held; (3) she was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.
The Department first argues that the plaintiff failed to establish by a preponderance of the evidence that her job performance was satisfactory. Here, the hearing officer concluded, and the record supports, that there was "no evidence that Hawkins' on-the-job performance was unsatisfactory."[5] (ROR, Volume I, Item 2, p. 27.) Hawkins was terminated because of her alleged undue familiarity with an inmate and not for poor or unsatisfactory job performance. (ROR, Volume 14, Items, 144, 154, 155, 158.) At the hearing, the Department's counsel stated that: "We are not disputing that [Hawkins'] performance was satisfactory." (ROR, Volume 5, Item 126, p. 186.) Accordingly there is substantial evidence in the record to support the hearing officer's finding that Hawkins was qualified for the her position.
The Department also claims that the hearing officer erred in concluding that Hawkins' discharge occurred in circumstances giving rise to an inference of discrimination. The hearing officer, however, found that Hawkins was one of two persons discharged for violating the undue familiarity rule while other employees suffered lesser sanctions, and that Hawkins and the other discharged employee were black females. These findings of the hearing officer are supported by substantial evidence. (ROR, Volume 5, Item 126, pp. 229-31; Volume 6, Item 127, pp. 288-91; Volume 10, Item 131, p. 1096; Volume 12, Item 133, pp. 1236-37.) Therefore, the hearing officer's finding of an inference of discrimination is supported by substantial evidence in the record.
The parties agree that the Department articulated a legitimate nondiscriminatory reason for Hawkins' termination — i.e. that the plaintiff's improper relationship with an inmate in violation of the undue familiarity provisions of the Department's employee handbook. Under theMcDonnell Douglas and Ann Howard's test, the burden would then shift to the plaintiff to prove that the reason advanced by the Department was a pretext for the actual reason, a discriminatory one. Hawkins had to prove that the reasons for her termination given by DOC were "unworthy of credence." Reeves v. Sanderson Plumbing Products, Inc., ___ U.S. ___,120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000), quoting Texas Department ofCommunity Affairs v. Burdine, 450 U.S. 248, 256. 101 S.Ct. 1089 (1981). CT Page 13533
According to McDonnell Douglas, Hawkins' proof could consist of evidence that persons other than black or those who were males were not similarly disciplined. Although the Department argues that Hawkins was among many males and females, black and white, that had been disciplined, only Hawkins and one other black female were terminated as a sanction.
The hearing officer found, (ROR, Volume 1, Item 2, p. 21), that the sanction taken against Hawkins was inconsistent with sanctions against men and white and Hispanic women for comparable or worse offenses. The hearing officer also found, (ROR, Volume 1, Item 2, p. 33), that the Department did not follow its handbook in finding "undue familiarity" and had to clarify it in the year following Hawkins' dismissal. The offense of undue familiarity was found by the hearing officer to be selectively enforced. The hearing officer's findings are supported by substantial evidence. (ROR, Volume 5, Item 126, pp. 192-93, 232; Volume 12, Item 133, pp. 1236-37, 1261; Volume 10, Item 131, p. 1096; Volume 6, Item 127, pp. 288-91; Volume 15, Items 160, 164, Volume 17, Item 169; Volume 11, Item 132, pp. 1179-1181.)
Since the evidence of pretext is supported by substantial evidence, the court may defer to the hearing officer's conclusion[6] that Hawkins met her burden of proof that there was both racial and gender discrimination. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Products, Inc., supra, 120 S.Ct. 2109.
The Department next claims the agreement between Hawkins and her union to resolve her grievance, by agreeing to a period of suspension from July 10 to December 11, 1992, constituted an accord and satisfaction. Accordingly, the Department maintains that the plaintiff's claims for damages under her CHRO action would be barred by her return to work under the grievance settlement.
 In order to prove an accord and satisfaction, the defendant must show that at the time of the agreement a good faith dispute existed over the existence of a debt or over an amount owed, and that the debtor and the creditor negotiated a contract of accord to settle the claim. . . . The accord must be a new agreement based upon new consideration. . . . The proponent must be able to show that there was a meeting of the minds, and that the offer by the debtor was clearly tendered as full satisfaction of the debt, and the CT Page 13534 payment was knowingly accepted.
Lamb v. Emhart Corp., 47 F.3d 551, 561-62 (2d Cir. 1995).
An accord and satisfaction thus may only occur where, after negotiations, there is a meeting of the minds and a new contract is formulated. Halloran v. Fischer, 126 Conn. 44, 46 (1939); Taft v. ValleyOil Co., 126 Conn. 154, 161 (1939).
Here, the hearing officer found that in settling her grievance and agreeing to a suspension, Hawkins never contemplated resolving her CHRO complaint. (ROR, Volume 1, Item 2, pp. 11, 39.) This finding of the hearing officer is supported by substantial evidence. As Hawkins stated, the union grievance and the CHRO matter were "two different things. My job and being treated unfairly are two different issues." (ROR, Item 133, p. 1293.) The evidence in the record shows that there was never a "meeting of the minds" and therefore, there can be no accord and satisfaction.
The final issue raised by DCC is that of mitigation of damages. As indicated above, the hearing officer found that Hawkins did not attempt to obtain another job, but spent her five month down-time researching the issue of unemployment compensation and assisting her union representatives in her grievance. (ROR, Volume 1, Item 2, p. 23.)
There is a duty to mitigate damages in civil rights actions. "[T]here is no logical reason why general principles on damages should not apply to a civil rights action." Zarcone v. Perry, 572 F.2d 52, 55 (2d Cir. 1978). General Statutes § 46a-86(b) provides that the hearing officer shall deduct from any back pay order "amounts which could have been earned with reasonable diligence." Our Supreme Court has also recognized that back pay awards in cases brought before the CHRO are subject to reasonable efforts to mitigate. Ann Howard's Apricot's Restaurant v.Commission on Human Rights and Opportunities, supra, 237 Conn. 229. This is, of course, the law in federal court too. See, e.g., Hawkins v. 1115Legal Service Care, 163 F.3d 684, 695 (2d Cir. 1998); NLRB v. ThalboCorp., 171 F.3d 102 (2d Cir. 1999).[7]
Here the hearing officer made two errors in applying the facts as she found them to the law. First, the hearing officer considered the duty to mitigate met by Hawkins spending her time in a law library, and not searching for comparable work. (ROR, Volume 1, Item 2, p. 39.) While she might receive a percentage credit for some of this library time, there still remains a duty to avoid increasing the employer's damages.
In addition, the hearing officer concluded that the Department was the CT Page 13535 only employer available to Hawkins. (ROR, Volume 1, Item 2, p. 41.) This is an unduly restrictive view of the duty to mitigate. Hawkins could have tried for a position as a security guard or a police officer. BPS GuardServices v. Intern. Union of United Plant Guard Workers, 45 F.3d 205, 211
(7th Cir. 1995). In general, there should be an effort made to find comparable work. Mason County Board of Education v. Superintendent ofSchools, 295 S.E.2d 719 (West Va. 1982) (teacher discharged should seek work at corporation).
Of course, what reduction should be made from a back pay award for a failure to mitigate is for the hearing officer to decide. Ann Howard'sApricot's Restaurant v. Commission on Human Rights and Opportunities, supra, 237 Conn. 229. Here, it was erroneous to give no reduction at all. The CHRO argues that the hearing officer applied a reduction to the back pay order by deducting from the gross wage award the amount paid to Hawkins for unemployment compensation. Under General Statutes §46a-86(b). unemployment compensation is deductible and a separate matter from interim earnings. Thus, the court cannot conclude that the hearing officer used the deduction for unemployment compensation as a means to address mitigation of damages. The hearing officer did not explicitly state that the reduction in back pay for unemployment compensation was because of a fail tire to mitigate. The case must be remanded to consider what percentage of Hawkins' lost wages should be off-set for failure to mitigate.
The plaintiff's appeal is sustained and is hereby ordered remanded to CHRO in accordance with this decision.
Henry S. Cohn, Judge